1  THE COURT: Ms. Gray, do you disagree in any
2  respect with that summary.
3  MS. GRAY: No, Your Honor. The elements are
4  correctly stated.
5  THE COURT: Mr. Ocampo Barajas, do you understand
6  if there were trial on these charges, the Government would
7  have to bring evidence to prove each of those elements
8  beyond a reasonable doubt.
9  THE DEFENDANT: Yes.
10  THE COURT: All right. Ms. Sameshima, please
11  summarize if this matter went to trial, what kind of
12  evidence as to the facts that the Government would offer at
13  the time of trial.
14  MS. SAMESHIMA: Yes, Your Honor. We would offer
15  the following facts if this case were to proceed to trial.
16  And that is that beginning some time in or around June or
17  July of 2004, the Defendant agreed with his co-defendants
18  Susan Darlene Makio and John Michael Waldroupe to distribute
19  and possess with intent to distribute quantities of
20  methamphetamine.
21  Mr. Waldroupe and Ms. Makio resided at various
22  hotels in Waikiki and agreed to provide the Defendant with a
23  place to stay within these hotels. And at the same time,
24  the Defendant provided both Waldroupe and Makio with
25  quantities of methamphetamine which Waldroupe distributed to

EXHIBIT G.

1  others and also assisted the Defendant in distributing
2  quantities of methamphetamine.
3           We'd also offer the testimony of a DEA agent
4  acting in an undercover capacity who was introduced to Mr.
5  Ocampo by an informant and the Defendant agreed to provide
6  this undercover agent with a sample of ice. Later that
7  evening -- this is on July 13th --
8           THE INTERPRETER: Slow down just a little.
9           MS. SAMESHIMA: On the evening of -- in the
10 evening of July 13th, 2004, Mr. Ocampo met with the
11 undercover DEA agent and provided him with a sample of ice
12 or methamphetamine. The sample was submitted to the DEA
13 laboratory for analysis and it was determined to contain --
14 to be .083 grams of d-methamphetamine hydrochloride.
15          THE INTERPRETER: Excuse me, may the Interpreter
16 request (inaudible) the amount that it was determined?
17          THE COURT: Point zero --
18          MS. SAMESHIMA: .083 grams.
19          The next day, July 14th, 2004, the Defendant
20 again met with the DEA agent, again who was acting in an
21 undercover capacity. The Defendant inquired whether the
22 sample was acceptable and confirmed that he could provide
23 the agent with additional quantities of ice.
24          In fact, at that same meeting, the Defendant
25 distributed about two ounces of ice to the DEA agent in the

- 30 -

EXHIBIT G

1  bathroom of the meeting place which was in fact a restaurant
2  in Waikiki.
3           The two ounces of suspected methamphetamine were
4  submitted to the DEA laboratory where they were analyzed and
5  determined to consist of 56.3 grams of d-methamphetamine
6  hydrochloride and it was determined that the purity of said
7  methamphetamine was 88 percent.
8           The next day, that being July 15th, 2004, a
9  search warrant was obtained and executed at room 2120 at the
10 Miramar Hotel, and as part of the investigation, it was
11 determined that that was where Mr. Ocampo had been staying
12 together with his co-defendants John Waldroupe and Darlene -
13 - Susan Darlene Makio.
14          As a result of the search warrant, the following
15 evidence was recovered:  eight clear plastic baggies
16 containing suspected methamphetamine in a black suitcase,
17 two clear plastic bags also containing suspected
18 methamphetamine in a night stand closet.  And the suspected
19 methamphetamine was sent to the DEA laboratory for analysis
20 and the forensic chemist who analyzed the substances
21 determined that they were a total of 217.3 grams of d-
22 methamphetamine hydrochloride, and that the purity of this
23 methamphetamine was 91 percent.
24          Defendant was arrested on this date, July --
25 believe July 15th.  He waived his rights and did make a

EXHIBIT G