ORIGINAL

EDWARD H. KUBO, JR. #2499
United States Attorney
District of Hawaii

BEVERLY WEE SAMESHIMA #2556
Assistant U.S. Attorney
Room 6100, PJKK Federal Bldg.
300 Ala Moana Boulevard
Honolulu, Hawaii  96850
Telephone:  (808) 541-2850
Facsimile:  (808) 541-2958
Email:  Beverly.Sameshima@usdoj.gov

Attorneys for Respondent
UNITED STATES OF AMERICA

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

NOV 30 2007

at 3 o'clock and 05 min. P M.
SUE BEITIA, CLERK

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| ARNULFO BARAJAS OCAMPO,<br><br>             Petitioner,<br><br>   vs.<br><br>UNITED STATES OF AMERICA,<br><br>             Respondent. | CV. NO. 07-00522 JMS-BMK<br>CR. NO. 04-00279 JMS<br><br>UNITED STATES' RESPONSE TO<br>MOTION UNDER 28 U.S.C. § 2255<br>TO VACATE, SET ASIDE OR CORRECT<br>SENTENCE BY A PERSON IN FEDERAL<br>CUSTODY; EXHIBITS A-E;<br>CERTIFICATE OF SERVICE |

TABLE OF CONTENTS

Page(s)

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . i-ii

I.   PROCEDURAL BACKGROUND . . . . . . . . . . . . . . . 1

II.  FACTUAL BACKGROUND . . . . . . . . . . . . . . . . 12

III. ARGUMENT . . . . . . . . . . . . . . . . . . . . . 15

     A.  Ocampo's Claims of "Judicial and Government
         Violations" During the Change of Plea Hearing are
         Wholly Without Merit . . . . . . . . . . . . . . 15

         1.  Ocampo's Sixth Amendment Right to a Speedy
             Trial was Not Violated . . . . . . . . . . . 15

         2.  Ocampo's Change of Plea Hearing Fully Complied
             With the Requirements of Rule 11 . . . . . . 18

         3.  The Court and Government did not Make
             "Ambiguous Statements" Regarding the Type,
             Quantity or Purity of the Drug at the Change
             of Plea Hearing . . . . . . . . . . . . . . 20

     B.  Ocampo's Claim of "Judicial Violation" During
         Sentencing is Likewise Without Merit . . . . . . 22

     C.  Ocampo's Claims that AFPD Gray Provided Ineffective
         Assistance of Counsel Are Not Supported By the
         Record . . . . . . . . . . . . . . . . . . . . . 23

         1.  Legal Standards . . . . . . . . . . . . . . 23

         2.  Each of Ocampo's Allegations of Ineffective
             Assistance of Counsel Lacks Merit as AFPD
             Gray's Representation was at All Times
             Professional and Reasonable . . . . . . . . 25

             a.  AFPD Gray did not Ignore, Neglect, or Fail
                 to Respond to Ocampo . . . . . . . . . . 26

                 i.   Ocampo was Provided with Copies of
                      Discovery Material . . . . . . . . 26

                 ii.  AFPD Gray Investigated Special Agent
                      Rothermund's Involvement as Ocampo
                      Requested . . . . . . . . . . . . . 26

Page(s)

        iii. AFPD Gray Did Not Neglect Ocampo . . 28

b.   AFPD Gray's Representation of Ocampo at
     the Change of Plea Hearing was Reasonable  29

     i.   AFPD Gray did not Force or Coerce
        Ocampo's Responses During the Plea
        Colloquy . . . . . . . . . . . . . .  29

     ii.  No Speedy Trial Violation Existed,
        Thus, AFPD Gray Had No Grounds to
        Object . . . . . . . . . . . . . . .  30

     iii. The Court Adequately Explained the
        Nature of the Charges Against Ocampo
        and, Thus, AFPD Gray Had No Grounds
        to Object . . . . . . . . . . . . .  31

     iv.  Neither the Court, nor the Government
        "Breached" Ocampo's Plea . . . . . .  31

c.   AFPD Gray's Representation of Ocampo at
     Sentencing was Reasonable . . . . . . . .  32

     i.   AFPD Gray Reviewed the PSR with
        Ocampo . . . . . . . . . . . . . . .  32

     ii.  AFPD Gray Sought the Lowest Possible
        Sentence for Ocampo . . . . . . . .  33

     iii. The Government Did Not Breach Ocampo's
        Plea and AFPD Gray Had No Grounds to
        Object . . . . . . . . . . . . . . .  34

d.   AFPD Gray's Representation of Ocampo During
     Appeal was Reasonable . . . . . . . . . .  35

     i.   AFPD Gray Contacted Ocampo to Discuss
        Appeal . . . . . . . . . . . . . . .  35

     ii.  AFPD Gray Complied with the
        Requirements of Anders v. California  35

3.   Ocampo Has Also Failed to Allege and Prove
   Prejudice as a Result of AFPD Gray's
   Performance . . . . . . . . . . . . . . . .  37

Page(s)

D.   Ocampo's Requests for Relief Should be Summarily
     Denied . . . . . . . . . . . . . . . . . . . . . 37

IV.  CONCLUSION . . . . . . . . . . . . . . . . . . . . . 39

## TABLE OF AUTHORITIES

<u>Cases</u>                                                    Page(s)

<u>Anders v. California</u>, 368 U.S. 738 (1967) . . . . . . . 11, 35-36

<u>Pennsylvania v. Finley</u>, 481 U.S. 551 (1987) . . . . . . . . . 39

<u>Sanchez v. United States</u>, 50 F.3d 1448 (9th Cir. 1995)   . . . 39

<u>Santobello v. New York</u>, 404 U.S. 257 (1971) . . . . . . . 22-23

<u>Shah v. United States</u>, 878 F.2d 1156 (9th Cir. 1989),
    <u>cert. denied</u>, 493 U.S. 869 (1989) . . . . . . . . . . . 38

<u>Shraiar v. United States</u>, 736 F.2d 817 (1st Cir. 1984)   . . . 38

<u>Strickland v. Washington</u>, 466 U.S. 668 (1984) . . . . . . 23, 25

<u>United States v. Dunham</u>, 767 F.2d 1395 (9th Cir. 1985)   . . . 18

<u>United States v. Frady</u>, 456 U.S. 152 (1982) . . . . . . . . . 18

<u>United States v. Martinez</u>, 885 F.3d 750 (9th Cir. 1989) . . . 28

<u>United States v. Ocampo</u>, 207 F. App'x 756 (9th Cir. 2006)   11, 36

<u>United States v. Quan</u>, 789 F.2d 711 (9th Cir. 1986),
    <u>cert. denied</u>, 478 U.S. 1044 (1986) . . . . . . . . . . 38

<u>United States v. Reyes</u>, 313 F.3d 1152 (9th Cir. 2002)   . . . . 18

<u>United States v. Schaflander</u>, 743 F.2d 714 (9th Cir. 1984),
    <u>cert. denied</u>, 470 U.S. 1058 (1985) . . . . . . . . . . 38

<u>Statutes and Rules</u>

18 U.S.C. § 2 . . . . . . . . . . . . . . . . . . . . . . . 1

18 U.S.C. § 3006A(2)(B) . . . . . . . . . . . . . . . . . . 37

18 U.S.C. § 3161 . . . . . . . . . . . . . . . . . . . . . 16

18 U.S.C. § 3161(c)(1) . . . . . . . . . . . . . . . . . . 16

18 U.S.C. § 3161(h)(8)(A) . . . . . . . . . . . . . . . . . 16

Statutes and Rules-Continued                                    Page(s)

18 U.S.C. § 3162(a)(2) . . . . . . . . . . . . . . . . . . .  18

18 U.S.C. § 3553(a) . . . . . . . . . . . . . . . . . . . .  10

21 U.S.C. § 841(a)(1) . . . . . . . . . . . . . . . . . . .  1-2

21 U.S.C. § 841(a)(1)(A) . . . . . . . . . . . . . . . . . .  1-2

21 U.S.C. § 846 . . . . . . . . . . . . . . . . . . . . . .  1

28 U.S.C. § 2255 . . . . . . . . . . . . . . . . . . . .  Passim

Fed. R. Crim. P. 11 . . . . . . . . . . . . . . . . . . . .  18

Fed. R. Crim. P. 11(b)(1)(G) . . . . . . . . . . . . . . . .  19

Fed. R. Crim. P. 11(b)(3) . . . . . . . . . . . . . . . . .  19

UNITED STATES' RESPONSE TO MOTION UNDER
28 U.S.C. § 2255 TO VACATE, SET ASIDE OR
CORRECT SENTENCE BY A PERSON IN FEDERAL CUSTODY

The United States of America, by its undersigned
counsel, hereby responds to Arnulfo Barajas Ocampo's ("Ocampo")
motion to vacate, set aside, or correct sentence under 28 U.S.C.
§ 2255.

I.    PROCEDURAL BACKGROUND

On July 15, 2004, by way of complaint, the government
accused Ocampo of possessing with intent to distribute at least
50 grams of methamphetamine, in violation of 21 U.S.C.
§ 841(a)(1) and 18 U.S.C. § 2.  On July 28, 2004, a federal grand
jury in the District of Hawaii returned a two-count Indictment
against Ocampo, along with two co-defendants, John Michael
Waldroupe ("Waldroupe") and Susan Darlene Makio ("Makio").  Count
1 charged that from a time unknown up to and including on or
about July 15, 2004, all three co-defendants conspired to
distribute and possess with intent to distribute 50 grams or more
of methamphetamine, its salts, isomers, and salts of its isomers,
approximately 394.3 grams (gross weight), in violation of 21
U.S.C. §§ 846, 841(a)(1) and 841(b)(1)(A).[1]  Count 2 charged that

_____

[1]  The Indictment listed the following overt acts in
furtherance of the conspiracy:  (1) Waldroupe and Makio
registered as guests on July 13, 2004, at the Miramar Hotel in
Honolulu, Hawaii;  (2) In or around July 2004, Ocampo resided at
various times in the Miramar Hotel and Ocean Resort Hotel with
Waldroupe and Makio;  (3) On or about July 13, 2004, Waldroupe and
Makio provided a sample of methamphetamine to Ocampo for
distribution to others;  and (4) On or about July 15, 2004,
Ocampo, Waldroupe, and Makio possessed a quantity of

on or about July 15, 2004, all three co-defendants possessed with intent to distribute 50 grams or more of methamphetamine, its salts, isomers, and salts of its isomers, approximately 335.4 grams (gross weight), in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A).

Ocampo initially plead not guilty to the charges. However, on May 12, 2005, he withdrew his not guilty plea and pled guilty to both counts as charged, without a plea agreement, before Magistrate Judge Leslie E. Kobayashi. A true and correct copy of the transcript from the Hearing on Motion for Withdrawal of Not Guilty Plea and to Plead Anew is attached as Exhibit A. At the change of plea hearing, Ocampo affirmed that he had not taken any kind of medication, alcohol, or drugs in the past twenty-four hours and that he felt well, alert, and able to understand the proceedings and the decisions he had to make. Exhibit A at 3. He denied having any mental health issues or drug addiction at the time he changed his plea. Exhibit A at 3. Ocampo also affirmed that he was fully satisfied with the legal representation he had received. Exhibit A at 5.

Ocampo acknowledged that he understood the charges against him, acknowledged that both counts carried minimum ten-year terms of imprisonment and potential maximum sentences of life, and acknowledged that both counts were further punishable

---

methamphetamine for distribution to others.

by minimum five-year terms and maximum lifetime terms of
supervised release and a fine of up to four million dollars.
Exhibit A at 5-8.  Ocampo expressly gave up and waived his right
to have a jury determine that he conspired to distribute and to
possess with intent to distribute fifty grams or more of
methamphetamine and that he possessed with the intent to
distribute fifty grams or more of methamphetamine under Counts 1
and 2, respectively.  Exhibit A at 6-7.  Moreover, he expressly
agreed that he was knowingly responsible for fifty grams or more
of methamphetamine as charged under each count of the Indictment.
Exhibit A at 6, 8.

       Ocampo also acknowledged that he would have to abide by
certain conditions when on supervised release and that his
convictions might affect his right to stay in the United States.
Exhibit A at 9-10.  Magistrate Judge Kobayashi also went over the
non-binding applicability of the sentencing guidelines to his
case and noted that a presentence report would be prepared, which
Ocampo would be able to comment on.  Exhibit A at 10-11.  Ocampo
affirmed that he understood that the sentence actually imposed
might be different from any estimate his counsel may have given
him.  Exhibit A at 10-11.  Ocampo also acknowledged that his
sentence would be based, in part, on admissions he made during
the change of plea hearing and that he did not have to admit any
disputed facts.  Exhibit A at 11.  Ocampo affirmed that he would

be bound by his plea, even if the sentence was more severe than

he expected and even if he did "not like the sentence imposed" by

the district court.   Exhibit A at 11.

The magistrate judge fully explained the rights that

Ocampo gave up by pleading guilty, including his right to plead

not guilty, to a jury trial, to counsel, to confrontation, to

testify or remain silent, to compulsory process, to a presumption

of innocence and to have the charges proven beyond a reasonable

doubt, and to jury unanimity.   Exhibit A at 12-13.   Ocampo

affirmed that he understood these rights and understood that he

waived them by pleading guilty.   Exhibit A at 13.   The magistrate

judge also confirmed that Ocampo understood that he had the right

to appeal.   Exhibit A at 13.

The government, at the request of the Court, recited

the elements of the charged offenses as well as the evidence it

would adduce if the case proceeded to trial.   Exhibit A at 13-18.

Among other things, the government asserted that it would prove

the following.   On July 13, 2004, Ocampo met with an undercover

government agent and gave him a sample of methamphetamine that,

when tested by the Drug Enforcement Agency ("DEA") laboratory,

was found to contain .083 grams of d-methamphetamine

hydrochloride.   Exhibit A at 16.   Ocampo met the undercover agent

again on July 14, 2004, confirmed that he could obtain more

methamphetamine, and gave the agent another quantity of drugs

4

that was later determined by the DEA laboratory to contain 56.3 grams of d-methamphetamine hydrochloride that was 88 percent pure. Exhibit A at 16-17. On July 15, 2004, government agents executed a search warrant on Room 2120 at the Miramar Hotel, the room Ocampo, Waldroupe, and Makio had been using. Exhibit A at 17. In the hotel room, agents found a quantity of drugs that was later determined by a DEA laboratory to contain 217.3 grams of d-methamphetamine hydrochloride that was 91 percent pure. Exhibit A at 17. The government further proffered that it would introduce at trial the statement Ocampo provided to government agents after his arrest, admitting that he had distributed methamphetamine to the undercover agent on July 13 and July 14, 2004, as well as statements made by Waldroupe and Makio claiming, among other inculpatory things, that the drugs found in the hotel room belonged to Ocampo. Exhibit A at 17-18.

When asked to describe what he did that made him guilty of the charged offenses, Ocampo admitted the following facts. Exhibit A at 16-23. He stayed with Makio and Waldroupe at the Miramar Hotel in July, 2004. Exhibit A at 19. Waldroupe and Makio gave him a sample of methamphetamine to shop around. Exhibit A at 19. Ocampo claimed that "without ... really realizing it, they used my knowledge to distribute or to plan to distribute" and that he did not "have much knowledge because of [his] addiction to alcohol and cocaine." Exhibit A at 19.

5

Ocampo stated that on July 14, 2004, he met with someone in a restaurant and distributed what laboratory tests later confirmed was 56.3 grams of 88 percent pure d-methamphetamine hydrochloride.  Exhibit A at 19-20.  Ocampo further admitted, in connection with Count 2, that he "tried to distribute fifty or more grams to another person."  Exhibit A at 20.  Specifically, Ocampo admitted that the drugs found in the hotel room belonged to him, that the drugs contained what laboratory tests later confirmed was 217.3 grams of 91 percent pure d-methamphetamine hydrochloride, and that he intended to sell and distribute it to other people.  Exhibit A at 20-21.

After admitting the foregoing facts, Ocampo pled guilty, as charged, to Counts 1 and 2 of the Indictment.  Exhibit A at 23-24.  In accord with the magistrate judge's recommendation, the district court formally accepted Ocampo's guilty pleas and adjudicated him guilty on both counts of the Indictment on June 1, 2005.

A probation officer prepared a presentence report ("PSR").  A true and correct copy of the PSR has been filed under separate cover.  The PSR recited the "offense conduct," and, under a section describing "offender characteristics," noted that Ocampo had been previously deported to Mexico in 1997 and that following sentencing in the present matter, removal proceedings would, once again, be commenced against him.  PSR at ¶¶ 10-18,

6

47–50a.  The PSR also noted that Ocampo had admitted to being a drug addict, having abused marijuana, cocaine, methamphetamine, and alcohol in the past.  PSR at ¶ 53.

The PSR computed the advisory guideline range as follows.  The base offense level was 34 pursuant to U.S.S.G. § 2D1.1(c)(4),[2] because the offenses involved at least 150 grams but less than 500 grams of "ice," that is, d-methamphetamine hydrochloride that was at least 80 percent pure.  PSR at ¶ 26. The PSR did not find that any victim-related, role-in-the-offense, or obstruction of justice adjustments applied.  PSR at ¶¶ 28-30.  The PSR also found that none of the Chapter Four enhancements applied.  PSR at ¶ 35.  On the other hand, the PSR reduced the offense level by three levels for acceptance of responsibility and for Ocampo's assistance to authorities.  PSR at ¶¶ 32, 33.  Thus, Ocampo's total offense level was 31.  PSR at ¶ 34.

Pursuant to U.S.S.G. §§ 4A1.1(b) and 4A1.2(e)(2), the PSR assigned two criminal history points for a prior drug-related conviction in California, for which Ocampo was sentenced to 180-days imprisonment and three years probation, and in connection with which a bench warrant remained outstanding at the time of sentencing in this matter.  PSR at ¶ 39.  The PSR assigned

---

[2]  The PSR cites U.S.S.G. § 2D1.1(c)(4), however, based on the quantity of drugs involved, it appears that the PSR should have referenced U.S.S.G. § 2D1.1(c)(3) instead.

another criminal history point pursuant to U.S.S.G. §§ 4A1.1(c)

and 4A1.2(e)(2) for a prior driving under the influence

conviction in Nevada, for which Ocampo was sentenced to a

suspended term of 60 days imprisonment, a fine, and community

service, and in connection with which a bench warrant also

remained outstanding.  PSR at ¶ 40.  The PSR added another two

points pursuant to U.S.S.G. § 4A1.1(d) because Ocampo was still

serving a term of probation in connection with the California

conviction when he committed the federal offenses in the present

matter.  PSR at ¶ 42.  Ocampo accordingly fell within a criminal

history category of III, as set forth in U.S.S.G. § 5A.  PSR at

¶ 43.

        Neither Ocampo, nor the government, objected to the

factual findings or guideline calculations contained in the PSR.

A true and correct copy of the transcript of Ocampo's Sentencing

is attached as Exhibit B.  At sentencing, Ocampo expressly

affirmed that he had read, reviewed, and discussed the PSR with

his counsel and that he was able to make any and all objections

to the report that he had wished to make.  Exhibit B at 2.  The

only factual assertion Ocampo disagreed with was paragraph 16 of

the PSR.  Ocampo disagreed with what he believed Co-defendant

Waldroupe had represented to the court, as noted by Ocampo's

counsel at sentencing.  Exhibit B at 3-4.

The district court adopted the PSR, noting that the PSR included and incorporated Ocampo's sentencing statement "as the factual findings of the court, as well as the conclusions as to the applicable guidelines." Exhibit B at 4-5. The district court noted that there was a statutory ten-year mandatory minimum sentence and that the advisory guideline range was 135 to 168 months imprisonment. Exhibit B at 5.

AFPD Gray requested that the Court sentence Ocampo to no more than the ten-year mandatory minimum. Exhibit B at 5. AFPD Gray urged the Court to consider that, because of the immigration detainer on him, Ocampo was not going to be able to receive the same benefits that other inmates are eligible to receive from the Bureau of Prisons upon completion of an intensive drug treatment program. Exhibit B at 7. Specifically, AFPD Gray noted that Ocampo was ineligible for the up to one year credit or "additional halfway house prerelease time" other inmates without detainers are eligible to receive. Exhibit B at 7. AFPD Gray also urged the Court to consider the effect a long sentence would have on Ocampo's family in Mexico, along with the other disadvantages he would face in the federal prison system on account of his immigration status. Exhibit B at 8. Ocampo allocuted, attributing his transgressions to drug addiction, and asked for mercy, forgiveness, and a second chance. Exhibit B at

9-10.  The government urged the court to impose a sentence within the guideline range.  Exhibit B at 10.

The district court rejected the notion that the factors that AFPD Gray articulated warranted imposition of the ten-year mandatory minimum sentence.  Exhibit B at 11.  The Court did, however, think that those factors were meritorious enough to warrant a sentence at the low end of the guideline range, despite the Court's initial inclination to "go higher" than 135 months.  Exhibit B at 11.  The district court recited numerous reasons for the 135-month sentence imposed on Ocampo and expressly noted that it was taking into account the statutory factors enumerated in 18 U.S.C. § 3553(a).  Exhibit B at 12.  Specifically, the district court emphasized the need to protect the public from Ocampo's commission of further crimes.  Exhibit B at 12.  The Court also noted, that Ocampo had previously been deported, but then illegally re-entered the country and continued to commit drug-related crimes and use numerous aliases.  Exhibit B at 13.

Accordingly, on April 6, 2006, the Court sentenced Ocampo to concurrent 135-month terms of imprisonment and concurrent five-year terms of supervised release on each count.  Exhibit B at 14.  In addition, the District Court ordered that Ocampo submit to removal proceedings.  Exhibit B at 15.  The District Court filed its written judgment on April 13, 2006.  On April 17, 2006, Ocampo timely filed a notice of appeal.  On

10

July 14, 2006, AFPD Gray filed a brief pursuant to Anders v. California, 386 U.S. 738 (1967), stating that there are no grounds for relief, along with a motion to withdraw as Ocampo's counsel of record.

On November 14, 2006, the Ninth Circuit affirmed the District Court's judgment and granted AFPD Gray's motion to withdraw as counsel. United States v. Ocampo, 207 F. App'x 756 (9th Cir. 2006). On October 16, 2007, Ocampo timely filed the instant motion to vacate under 28 U.S.C. § 2255. See 28 U.S.C. § 2255. In his motion, Ocampo claims that his sentence should be vacated based upon "judicial and government violations" at his change of plea hearing, and a "judicial violation" at his sentencing. In addition, Ocampo claims that Assistant Federal Public Defender, Donna M. Gray ("AFPD Gray"), his attorney in the underlying criminal case, provided him with ineffective assistance of counsel.

In order to respond to Ocampo's § 2255 motion, the United States filed a motion with this Court seeking a judicial finding that, by filing the instant motion, Ocampo has waived his attorney-client privilege with AFPD Gray. On October 29, 2007, the Court issued an order finding that Ocampo waived his attorney-client privilege as to the instant § 2255 proceedings.

11

II.  <u>FACTUAL BACKGROUND</u>

            The instant case involved a conspiracy to distribute
and to possess with intent to distribute drugs.  The
investigation of this case was initiated when a cooperating
source (CS) provided information that Ocampo was distributing
crystal methamphetamine in Honolulu, Hawaii.  PSR at ¶ 10.  On
July 12, 2004, the CS met Ocampo in a bar in Honolulu.  PSR at
¶ 11.  Ocampo told the CS that he regularly distributed pound
quantities of methamphetamine.  PSR at ¶ 11.  Based upon this
information, investigators instructed the CS to contact Ocampo
and conduct a controlled transaction of crystal methamphetamine
the following day.  PSR at ¶ 11.  Ocampo agreed to meet the CS at
a bar in Waikiki on July 13, 2004.  PSR at ¶ 11.  On July 13,
2004, the CS, along with an undercover agent, met Ocampo at
Captain Zach's Bar.  PSR at ¶ 11.  During the meeting, Ocampo
related that he was in possession of approximately 10 pounds of
crystal methamphetamine.  PSR at ¶ 11.  At the request of the
undercover agent, Ocampo left the bar to retrieve a drug
"sample."  PSR at ¶ 11.  Investigators maintained surveillance of
Ocampo and observed him enter and exit the Ocean Resort Hotel
located in Waikiki.  PSR at ¶ 11.  Ocampo returned to the bar and
presented the undercover agent with a bag containing drugs that
was later determined by a DEA laboratory to contain a total net

12

weight of .083 gram of d-methamphetamine hydrochloride.  PSR at ¶ 11.

On July 14, 2004, the CS contacted Ocampo and arranged to purchase two ounces of methamphetamine.  PSR at ¶ 12.  Later on July 14, 2004, Ocampo met the CS and undercover agent at the La Cucaracha Restaurant in Honolulu.  PSR at ¶ 12.  Ocampo presented the undercover agent with two plastic bags containing crystal methamphetamine, in exchange for $3,600.  PSR at ¶ 12.  Ocampo indicated that he had access to additional quantities of crystal methamphetamine.  PSR at ¶ 12.  Agents subsequently arrested Ocampo.  PSR at ¶ 12.  DEA laboratory reports later identified the recovered drugs as a substance containing a total net weight of 56.3 grams of d-methamphetamine hydrochloride with 88 percent purity.  PSR at ¶ 12.

After his arrest, Ocampo waived his constitutional rights and provided a statement to the investigators.  PSR at ¶ 13.  Ocampo admitted that he conducted the drug transactions on July 13, 2004 and July 14, 2004.  PSR at ¶ 13.  He further admitted that he unlawfully entered the United States and was residing at the Miramar Hotel in Waikiki.  PSR at ¶ 13.  During a search of Ocampo, investigators recovered a hotel key that accessed Room 2120 of the Miramar Hotel.  PSR at ¶ 13.  Investigators later determined that Room 2120 of the Miramar Hotel was registered to Makio and Waldroupe.  PSR at ¶ 13.

On July 15, 2004, investigators executed a federal search warrant at Room 2120 of the Miramar Hotel. PSR at ¶ 14. Among other items recovered, investigators found a digital scale, drug paraphernalia, a sock containing 8 plastic bags of drugs, and two other bags of drugs. PSR at ¶ 14. DEA laboratory reports subsequently identified the recovered drugs as a substance containing a total net weight of 217.3 grams of d-methamphetamine hydrochloride with a 91 percent purity and 55.9 grams of d-methamphetamine hydrochloride with a 96 percent purity. PSR at ¶ 14.

Both Makio and Waldroupe were arrested at the Miramar Hotel on July 15, 2004. PSR at ¶¶ 14-16. After their arrest, Makio and Waldroupe each waived their constitutional rights, agreed to cooperate with investigators, and provided a statement to investigators. PSR at ¶¶ 15, 16. Both Makio and Waldroupe, in their statements, indicated that they allowed Ocampo to reside with them in Waikiki. PSR at ¶¶ 15, 16. They stated that they initially resided at the Ocean Resort Hotel and later relocated to Room 2120 of the Miramar Hotel. PSR at ¶¶ 15, 16. Both Makio and Waldroupe stated that they were regular users of narcotics. PSR at ¶¶ 15, 16. Waldroupe further stated that the drugs recovered from the Miramar Hotel belonged to Ocampo. PSR at ¶ 16.

14

III. <u>ARGUMENT</u>

A district court may grant relief under § 2255 if it determines that "the judgment was rendered without jurisdiction, or that the sentence imposed was not authorized by law or otherwise open to collateral attack, or that there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack." 28 U.S.C. § 2255.

Ocampo raises at least three grounds in his § 2255 motion: (1) that "judicial and government violations" occurred during his plea colloquy; (2) that "judicial violations" occurred at his sentencing; and (3) that he was denied effective assistance of counsel.

A. Ocampo's Claims of "Judicial and Government Violations" During the Change of Plea Hearing are Wholly Without Merit

Ocampo argues that during the change of plea hearing, both the Court and the government violated his right to a speedy trial and also violated the requirements of Rule 11 of the Federal Rules of Criminal Procedure.

1. Ocampo's Sixth Amendment Right to a Speedy Trial was Not Violated

Ocampo claims that his right to a speedy trial was violated because 219 days elapsed between the date of his Indictment, on July 28, 2004, and the entry of his guilty plea, on May 12, 2005. Ocampo 2255 Memorandum at 18-19. The Speedy

15

Trial Act of 1974, codified at 18 U.S.C. § 3161, provides,
generally, as follows:

> [i]n any case in which a plea of not guilty is entered,
> the trial of a defendant charged in an information or
> indictment with the commission of an offense shall
> commence within seventy days from the filing date (and
> making public) of the information or indictment, or
> from the date the defendant has appeared before a
> judicial officer of the court in which such charge is
> pending, whichever date last occurs.

18. U.S.C. § 3161(c)(1).

Section 3161(h)(8)(A) provides, in part, that the
following periods of delay shall be excluded in computing the
time within which the trial must commence:

> [a]ny period of delay resulting from a continuance
> granted by any judge on his own motion or at the
> request of the defendant or his counsel or at the
> request of the attorney for the Government, if the
> judge granted such continuance on the basis of his
> findings that the ends of justice served by taking such
> action outweigh the best interest of the public and the
> defendant in a speedy trial.

In the instant case, Ocampo was arrested on July 14,
2004.  A criminal complaint, as well as a motion to detain, was
filed against Ocampo on July 15, 2004.  Also on July 15, 2004,
Ocampo made his initial appearance in the district court before
Magistrate Judge Kevin S.C. Chang.  On July 28, 2004, a two-count
Indictment was filed against Ocampo, along with Co-defendants
Waldroupe and Makio.  Accordingly, pursuant to 18 U.S.C.
§ 3161(c)(1), Ocampo's trial should have commenced within 70 days
of July 28, 2004, the date of the Indictment.  On July 30, 2004,

Ocampo entered a plea of not guilty and his case was set for trial on September 28, 2004.

On August 26, 2004, Co-defendants Ocampo and Makio, along with the government, stipulated and agreed, and the Court so ordered, that the trial date be continued from September 28, 2004 to January 11, 2005. A true and correct copy of the Stipulation and Order to Continue Trial Date is attached as Exhibit C. The Court found that the ends of justice were served by granting a continuance and outweighed the interest of the defendants and the public in a speedy trial. Exhibit C. Accordingly, the period of time from September 28, 2004, up to and including January 11, 2005, was excluded for purposes of computing time under the Speedy Trial Act.

On December 13, 2004, Co-defendants Ocampo, Waldroupe, and Makio and the government stipulated and agreed, and the Court so ordered, that the trial date be continued from January 11, 2005 to June 1, 2005. A true and correct copy of the Stipulation and Order Continuing Trial is attached as Exhibit D. The Court found that the ends of justice were served by granting a continuance and outweighed the interest of the defendants and the public in a speedy trial. Exhibit D. Accordingly, the period of time from January 11, 2005, up to and including June 1, 2005, was excluded for purposes of computing time under the Speedy Trial Act.

17

On May 12, 2005, a hearing was held on Ocampo's Motion for Withdrawal of Not Guilty Plea and to Plead Anew.  At this hearing, Ocampo entered guilty pleas as to Counts 1 and 2 of the Indictment.  As a result of the two continuances, the periods of time from September 28, 2004 to January 11, 2005, and from January 11, 2005 to June 1, 2005, are excluded for purposes of computing time under the Speedy Trial Act.  Accordingly, only 62 days elapsed from July 28, 2004, the date of Ocampo's Indictment, until May 12, 2005, the date he plead guilty, and Ocampo's right to a speedy trial was not violated.

Even if Ocampo's speedy trial right had been violated, pursuant to 18 U.S.C. § 3162(a)(2), Ocampo has waived his right to challenge the issue as he failed to move for dismissal of the indictment prior to his entry of a guilty plea.  United States v. Reyes, 313 F.3d 1152, 1159 (9th Cir. 2002).  Moreover, Ocampo failed to raise this issue on direct appeal.  United States v. Dunham, 767 F.2d 1395, 1397 (9th Cir. 1985) (citing United States v. Frady, 456 U.S. 152, 168 (1982)).

2.    Ocampo's Change of Plea Hearing Fully Complied With the Requirements of Rule 11

Ocampo next argues that the Court and the government violated Rule 11 of the Federal Rules of Criminal Procedure during the change of plea hearing because the Court failed to state the nature of Ocampo's offenses, the Court had the government summarize the essential elements of the offense, and

18

the Court failed to inquire regarding the facts surrounding Ocampo's guilty pleas.  Ocampo 2255 Memorandum at 20, Ocampo Affidavit at ¶ 10.  Each of these claims are not supported by the record.

Rule 11 requires, among other things, that the judge inform the defendant of, and determine that the defendant understands the nature of each charge to which the defendant is pleading.  Fed. R. Crim. P. 11(b)(1)(G).  In addition, the Court must determine that there is a factual basis for the plea prior to entering judgment on a guilty plea.  Fed. R. Crim. P. 11(b)(3).

In the instant case, Judge Kobayashi ensured that Ocampo understood the nature, elements, and factual predicate of the charged offenses.  The Court requested that the government summarize the essential elements of each charge.  Exhibit A at 13.  After the government summarized the essential elements of the charges, the Court stated, "Mr. Ocampo Barajas, do you understand if there were trial on these charges, the Government would have to bring evidence to prove each of those elements beyond a reasonable doubt."  Exhibit A at 15.  Ocampo responded affirmatively.  Exhibit A at 15.

The Court then requested that the government summarize the evidence and facts the government would have offered if the case proceeded to trial.  Exhibit A at 15.  After the government

completed its summary, the Court then stated:  "All right.
Mr. Ocampo Barajas, tell me in your own words what it is that you
did that makes you guilty of Count 1, which charges you with
knowingly and intentionally conspiring to distribute and possess
with the intent to distribute fifty grams or more of
methamphetamine.  What did you do?"  Exhibit A at 18-19.  Ocampo
responded, "[w]ell, I don't have much knowledge because of my
addiction to alcohol and cocaine, and without my really realizing
it, they used my knowledge to distribute or to plan to
distribute."  Exhibit A at 19.  The Court then posed a lengthy
series of questions to Ocampo to ensure that there was a factual
basis for Ocampo's plea.  Exhibit A at 18-24.  Accordingly, the
change of plea hearing fully complied with the requirements of
Rule 11.

      3.    The Court and Government did not Make "Ambiguous
           Statements" Regarding the Type, Quantity or Purity
           of the Drug at the Change of Plea Hearing

      Ocampo claims that the Court and the government made
purportedly "ambiguous statements" regarding the type, quantity
or purity of the drug at issue by suing the terms "ice,"
"d-methamphetamine hydrochloride," and "methamphetamine" during
the change of plea hearing.  Ocampo 2255 Memorandum at 13-14;
Ocampo Affidavit at ¶¶ 14, 15.  Ocampo appears to mistakenly
believe that ice, d-methamphetamine hydrochloride, and
methamphetamine are three separate drugs and that by using these

20

terms during the change of plea hearing, the Court and the
government "changed" the type of drug Ocampo was charged with in
the Indictment.

The Indictment charged Ocampo with conspiring to
"distribute and possess with the intent to distribute fifty grams
or more of methamphetamine, its salts, isomers, and salts of its
isomers" and "possession with the intent to distribute fifty
grams or more of methamphetamine, its salts, isomers, and salts
of its isomers." Ocampo appears to argue that the type of drug
he was charged with and to which he pled guilty for was
"methamphetamine," but that the drug type was "changed" during
the plea colloquy due to the fact that the government, when asked
by the Court to summarize the kind of evidence the government
would offer if the case had proceeded to trial, used the terms
"ice" and "d-methamphetamine hydrochloride," in addition to the
term "methamphetamine," in its summary. Ocampo appears to argue
that "ice" and "methamphetamine" are different types of drugs and
that the government's use of the term "ice" during the plea
colloquy somehow increased his offense level. Ocampo argues that
both the government and the Court "breached Defendant's plea,"
apparently claiming that there was some sort of "contract"
between himself, the Court, and the government that the type of
drug he was charged with and pled guilty to was
"methamphetamine."

21

As mentioned previously, the drug Ocampo was charged with in Counts 1 and 2 of the Indictment was "methamphetamine, its salts, isomers and salts of its isomers." "Ice" is the commonly used street vernacular for "methamphetamine." In addition, according to the United States Sentencing Guidelines Manual, the term "ice" also means a "mixture or substance containing d-methamphetamine hydrochloride of at least 80% purity." U.S.S.G. § 2D1.1(c), n. (C). Thus, contrary to Ocampo's belief, the terms "methamphetamine," "ice," and "d-methamphetamine hydrochloride" do not refer to 3 separate types of drugs for purposes of sentencing. Ocampo was not subjected to a higher offense level, nor were his guilty pleas "breached," as a result of the Court's and the government's use of the terms "ice" and "d-methamphetamine hydrochloride."

B.    Ocampo's Claim of "Judicial Violation" During Sentencing is Likewise Without Merit

Ocampo alleges that the Court "rejected to enforce Defendant's oral plea" at sentencing. Ocampo 2255 Memorandum at 14, 20-21. In addition, Ocampo appears to allege that the government breached his plea. Ocampo 2255 Memorandum at 20. However, Ocampo does not provide any further explanation of the Court's and the government's alleged violation or breach of his plea, other than citing to a Supreme Court case, Santobello v. New York, 404 U.S. 257 (1971). Ocampo 2255 Memorandum at 20. Presumably, this argument, once again, rests on Ocampo's mistaken

belief that "ice," "d-methamphetamine hydrochloride," and "methamphetamine" are three different types of drugs and that he only pled guilty to offenses involving "methamphetamine." As previously discussed, this belief is unfounded.

Moreover, Santobello is entirely distinguishable from the instant case. Santobello involved a defendant who withdrew his previous not guilty plea and pleaded guilty to a lesser-included offense after negotiations with the prosecutor, who agreed to make no recommendation as to the sentence. At defendant's sentencing, a new prosecutor recommended the maximum sentence, which the judge imposed. The defendant unsuccessfully attempted to withdraw his guilty plea and his conviction was affirmed on appeal. The Supreme Court remanded the case for reconsideration, holding that "when a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be a part of the inducement or consideration, such promise must be fulfilled." Santobello, 404 U.S. at 499. In the instant case, no such promise or agreement existed between Ocampo and the government. Thus, Santobello is not controlling or even applicable.

C.    Ocampo's Claims that AFPD Gray Provided Ineffective
       Assistance of Counsel Are Not Supported By the Record

       1.   Legal Standards

The Supreme Court, in Strickland v. Washington, 466 U.S. 668 (1984), set forth a two-prong test for determining

23

whether a criminal defendant received ineffective assistance of counsel. In order for a criminal defendant's sentence to be overturned based on ineffective assistance of counsel, the defendant must first prove that the performance of counsel, considering all the circumstances, was so deficient that he or she was not functioning as "counsel" as guaranteed under the Sixth Amendment. Second, the defendant must prove that the deficient performance prejudiced the defendant by depriving him of a fair trial. Id. at 691-92. However, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. Id. at 697.

To show that counsel's performance fell below an objective standard of reasonableness, the defendant must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. Id. at 690. The Court must then determine whether in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance. Id. In making that determination, counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. Id.

Even if the Court finds that counsel's performance was deficient, relief cannot be granted absent a showing of

24

prejudice.  To affirmatively prove prejudice, the defendant must show that there is a reasonable probability that, but for counsel's conduct, the result of the proceeding would have been different.  Id. at 694.  According to Strickland, "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome."  Id.

Indeed, the defendant who raises a claim of ineffective assistance of counsel has a very heavy burden to bear.  As the court stated in Strickland:  "Judicial scrutiny of counsel's performance must be highly deferential.  It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable."  Id. at 689.

> 2.  Each of Ocampo's Allegations of Ineffective Assistance of Counsel Lacks Merit as AFPD Gray's Representation was at All Times Professional and Reasonable

Ocampo raises numerous claims regarding AFPD Gray's alleged failures throughout the course of her representation. However, in the instant case, there is absolutely no evidence that AFPD Gray's performance fell below an objective standard of reasonableness under prevailing norms.

a. AFPD Gray did not Ignore, Neglect, or Fail to Respond to Ocampo

i. Ocampo was Provided with Copies of Discovery Material

Ocampo insinuates that AFPD Gray did not provide him with copies of materials disclosed by the government during discovery. Ocampo 2255 Memorandum at 2-3; Ocampo Affidavit at ¶ 9. A true and correct copy of the declaration of Donna M. Gray is attached as Exhibit E. As AFPD Gray indicates in her declaration, discovery was provided by the government on August 16, 2004, and a copy was mailed to Ocampo at the Federal Detention Center. Exhibit E at ¶ 2. Accordingly, Ocampo's claim has no basis in fact.

ii. AFPD Gray Investigated Special Agent Rothermund's Involvement as Ocampo Requested

Ocampo alleges that AFPD Gray ignored his request to investigate the involvement of an agent who was purportedly under investigation for corruption. Ocampo 2255 Memorandum at 2-3; Ocampo Affidavit at ¶ 18. Ocampo asserts that DEA Special Agent Michael D. Rothermund was "one of the agents on his (Ocampo's) case" and was under investigation for corruption. Ocampo 2255 Memorandum at 2. Ocampo states that "some persons that were arrested at the same place that Barajas-Ocampo in a drug conspiracy" had their charges dismissed because of Special Agent Rothermund's involvement in the investigation. Ocampo 2255

26

Memorandum at 2.   Ocampo states that he provided this information to AFPD Gray, but that AFPD Gray informed him that "this issue wouldn't help him because S/A Michael D. Rothermund was not assigned to his case."   Ocampo 2255 Memorandum at 3.   Ocampo accuses AFPD Gray of lying and violating his Sixth Amendment right to competent defense because Special Agent Rothermund's signature appears on certain Reports of Investigation, evidencing his participation in Ocampo's case.   Ocampo 2255 Memorandum at 4.

As AFPD Gray indicates in her declaration, she did look into this matter, as requested by Ocampo.   Exhibit E at ¶ 11. However, AFPD Gray was never able to verify whether Special Agent Rothermund was under investigation for corruption.   Exhibit E at ¶ 11.   AFPD Gray learned that Special Agent Rothermund had very limited involvement in Ocampo's case.   Exhibit E at ¶ 11. Special Agent Rothermund participated in the execution of the search warrant at Room 2120 of the Miramar Hotel on July 15, 2004, however, his involvement was limited to the documentation of drug evidence seized in the hotel room in order to establish proper chain of custody.   Exhibit E at ¶ 11.   AFPD Gray determined that an attempt to get the charges against Ocampo dismissed, based on Special Agent Rothermund's involvement in the investigation, would not have succeeded because:   (1) it was unclear whether Rothermund was under investigation; (2) Rothermund's involvement in Ocampo's case was too tenuous and

27

ancillary; and (3) Rothermund had no involvement in the two hand-to-hand methamphetamine sales Ocampo conducted on July 13 and 14, 2004.  Exhibit E at ¶ 11.  Accordingly, Ocampo's allegations that AFPD Gray failed to investigate the matter and lied about Rothermund's involvement in the case are unfounded.  AFPD Gray's decision to forgo seeking dismissal of the charges against Ocampo was strategic and based on her reasonable professional judgment. See, e.g., United States v. Martinez, 885 F.3d 750, 755 (9th Cir. 1989).

### iii. AFPD Gray Did Not Neglect Ocampo

Lastly, Ocampo claims that AFPD Gray failed to respond to his letters, discuss issues with him, and generally neglected him.  Ocampo 2255 Memorandum at 22.  As AFPD Gray's declaration indicates, Ocampo speaks Spanish, however, his letters to her were written, presumably by someone else, in English.  Exhibit E at ¶ 13.  Thus, whenever AFPD Gray received a letter from Ocampo, rather than responding in writing, she would arrange to personally visit him at the FDC, along with an interpreter, to discuss the issues Ocampo raised in his letters.  Exhibit E at ¶ 13.  As further evidence of AFPD Gray's diligent representation, and contrary to Ocampo's claims, AFPD Gray indicated that she met with Ocampo, with the aid of an interpreter, 16 times over the course of her representation, from October 16, 2004 to April 6, 2006.  Exhibit E at ¶ 14.

28

Accordingly, AFPD Gray can hardly be said to have ignored, neglected, or failed to respond to Ocampo.

> b.    AFPD Gray's Representation of Ocampo at the
>       Change of Plea Hearing was Reasonable

Ocampo alleges that AFPD Gray's representation at the May 12, 2005, change of plea hearing was deficient because she guided his responses during the plea colloquy, failed to object to a violation of his speedy trial right, and failed to object to the Court's failure to explain the nature of the charges against him.

> i.    AFPD Gray did not Force or Coerce
>       Ocampo's Responses During the Plea
>       Colloquy

Ocampo claims that AFPD Gray "guided" his responses to Magistrate Judge Kobayashi during the plea colloquy on May 12, 2004. Ocampo Affidavit at ¶¶ 9, 16. Ocampo claims that "counsel Gray told her client that the only way to get a lesser sentence could be if he agreed to follow her direction to respond to the court and promised him to do her best to get a lesser sentence for her client." Ocampo 2255 Memorandum at 5. Ocampo further stated that AFPD Gray "promised him to do her best to get a lesser sentence for her client." Ocampo 2255 Memorandum at 5.

AFPD Gray may have instructed Ocampo to follow her lead during the plea colloquy to help ensure that he would receive the lowest possible sentence. However, this can hardly rise to the level of ineffective assistance of counsel. There is no evidence

29

that AFPD Gray forced Ocampo to respond to the Court's questions in any particular way.  In addition, Ocampo fails to allege or prove that he was prejudiced in any way by following AFPD Gray's lead.

Moreover, the Court took numerous steps to ensure that Ocampo's plea was entered freely, knowingly, and voluntarily. Exhibit A at 2-5.  The Court, among other things, asked Ocampo if he was "fully satisfied with the legal representation" he received from AFPD Gray.  Exhibit A at 5.  Ocampo answered affirmatively.  Exhibit A at 5.  There is no evidence that AFPD Gray's conduct fell outside the wide range of professionally competent assistance.

        ii.  No Speedy Trial Violation Existed, Thus,
           AFPD Gray Had No Grounds to Object

As discussed above, there was no violation of Ocampo's speedy trial right due to the exclusion of periods of delay resulting from two trial continuances.  See infra Part III.A.1. As such, AFPD Gray had no basis for objecting at the change of plea hearing, or at any other time during her representation of Ocampo.  AFPD Gray's failure to object to a speedy trial violation was reasonable and Ocampo cannot establish that he was prejudiced since no speedy trial violation existed.

30

### iii. The Court Adequately Explained the Nature of the Charges Against Ocampo and, Thus, AFPD Gray Had No Grounds to Object

Again, as discussed above, the Court more than adequately informed Ocampo of, and determined that Ocampo understood, the nature of each charge to which he was pleading guilty. See infra Part III.A.2. Accordingly, AFPD Gray had no reason to raise an objection. Moreover, had AFPD Gray objected, that objection would more than likely have been overruled, thus, Ocampo cannot establish prejudice since the outcome would not have been different had AFPD Gray objected.

### iv. Neither the Court, nor the Government "Breached" Ocampo's Plea

As discussed above, Ocampo seems to believe that his pleas of guilty to Counts 1 and 2 of the Indictment charging him with "methamphetamine" were somehow "breached" by both the Court and the government by virtue of their use of the terms "ice" and "d-methamphetamine hydrochloride," in addition to the term "methamphetamine," at the change of plea hearing. See infra Part III.A.3. Ocampo mistakenly believes that "methamphetamine," "ice," and "d-methamphetamine hydrochloride" are three separate drugs and that the Court's and government's use of all three terms somehow exposed him to a higher offense level and sentence. As previously discussed, Ocampo plead guilty to, and was sentenced for, offenses relating to one type of drug –

31

"methamphetamine, its salts, isomers and salts of its isomers,"
consistent with the indictment.  In addition, Ocampo plead guilty
without a plea agreement.  Neither the Court, nor the government,
breached any plea or plea agreement with Ocampo.  Thus, AFPD Gray
had no basis to raise an objection regarding this matter at any
point during the proceedings.

> c.   AFPD Gray's Representation of Ocampo at
>      Sentencing was Reasonable

Ocampo argues that AFPD Gray's representation during
the sentencing phase of his case was ineffective because AFPD
Gray did not review the PSR with him, did not file a motion for
downward departure, as he had requested, was not successful in
her request that the Court sentence Ocampo to the mandatory
minimum 120 months; and made statements regarding Ocampo's
alienage and immigration status.  Ocampo Affidavit at ¶¶ 9, 18,
22, 23.

> i.   AFPD Gray Reviewed the PSR with Ocampo

Contrary to Ocampo's allegation, AFPD Gray filed a
response to the draft PSR on February 10, 2006.  Exhibit E at
¶ 12.  A true and correct copy of the Response to the Draft
Presentence Report has been filed under separate cover.  Included
in the response to the draft PSR is a clarification in which
Ocampo disputes Waldroupe's statement that the drugs recovered
from the hotel room belonged to Ocampo, as contained in paragraph
16 of the draft PSR.  On April 6, 2006, at Ocampo's sentencing,

32

the Court asked AFPD Gray and Ocampo if they had "both had a full opportunity to read, review, and discuss the presentence report and the addendum and make any and all objections to the report" that they wished.  Exhibit B at 2.  Both AFPD Gray and Ocampo affirmed that they had reviewed and discussed the PSR.  Exhibit B at 2.  Subsequently, the Court inquired whether AFPD Gray had any objections to the guideline calculations.  Exhibit B at 3.  AFPD Gray indicated that she had no objections.  Exhibit B at 3.  The Court next turned to Ocampo's objections to the factual statements as set forth in Ocampo's response to the draft PSR.  Exhibit B at 3.  AFPD Gray informed the Court that "what Mr. Ocampo wished me to do in our response to the draft report was simply to give his version of the role that he played, which differed from the version that he believed was being given to the court by the co-defendant Waldroupe."  Exhibit B at 3-4.  Accordingly, it is clear that AFPD Gray reviewed the draft PSR with Ocampo and that the Response to the Draft Presentence Report addressed Ocampo's desire to clarify or dispute the factual statements contained in paragraph 16 of the draft PSR.  Thus, Ocampo's allegation is unfounded.

### ii.  AFPD Gray Sought the Lowest Possible Sentence for Ocampo

Ocampo claims that AFPD Gray was ineffective because she failed to file a motion for downward departure, as he had requested, failed to seek "mitigating factors" on his behalf, and

mentioned Ocampo's alienage and ineligibility for certain sentencing reductions. Ocampo Affidavit at ¶¶ 18, 23. Contrary to Ocampo's claims, AFPD Gray filed a Sentencing Memorandum requesting that the Court sentence Ocampo below the advisory guideline range (135 to 168 months) to 120 months, the statutory mandatory minimum term. Exhibit E at ¶ 12. A true and correct copy of the Sentencing Memorandum has been filed under separate cover. While it is true that AFPD Gray mentioned Ocampo's status as an illegal alien who had a detainer placed upon him, she arguably did so in the hopes that the Court would take into consideration the fact that Ocampo's immigration status would render him ineligible for various sentence reductions and grant her request to sentence Ocampo below the applicable guideline range. The Court was, in fact, persuaded by some of AFPD Gray's arguments and sentenced Ocampo to 135 months, the bottom of the guideline range, rather than something higher, as the Court indicated it was initially inclined. Exhibit B at 11. Again, Ocampo's allegations lack any factual basis.

### iii. The Government Did Not Breach Ocampo's Plea and AFPD Gray Had No Grounds to Object

As discussed above, neither the government, nor the Court breached Ocampo's guilty pleas. See infra Parts III.A.3. and III.B. Thus, AFPD Gray had no factual or legal basis to object.

    d.   AFPD Gray's Representation of Ocampo During
        Appeal was Reasonable

Ocampo argues that AFPD Gray provided him with ineffective assistance of counsel during his appeal because she failed to contact him to discuss his appeal and otherwise neglected and "waived" his appeal, thereby failing to comply with the requirements established in Anders v. California, 368 U.S. 738 (1967). Ocampo 2255 Memorandum at 22; Ocampo Affidavit at ¶¶ 24, 25.

    i.   AFPD Gray Contacted Ocampo to Discuss
        Appeal

Contrary to Ocampo's claim, after judgment was entered, AFPD Gray indicated that Ocampo informed her that he wanted to file an appeal. Exhibit E at ¶ 15. AFPD Gray met with Ocampo and advised him that she did not believe he had any issues to appeal. Exhibit E at ¶ 15. She informed him that she would be filing a brief pursuant to Anders v. California, 368 U.S. 738 (1967). Exhibit E at ¶ 15. Accordingly, Ocampo's allegation is unfounded.

    ii.   AFPD Gray Complied with the Requirements
        of Anders v. California

Ocampo appears to further argue that AFPD Gray was ineffective because she failed to comply with the requirements of Anders v. California. The Supreme Court, in Anders, stated that:

> "[Counsel's] role as advocate requires that he support
> his client's appeal to the best of his ability. Of
> course, if counsel finds his case to be wholly

35

frivolous, after a conscientious examination of it, he
should so advise the court and request permission to
withdraw.  That request must, however, be accompanied
by a brief referring to anything in the record that
might arguably support the appeal.  A copy of counsel's
brief should be furnished the indigent and time allowed
him to raise any points that he chooses; the court -
not counsel - then proceeds, after a full examination
of all the proceedings, to decide whether the case is
wholly frivolous.  If it so finds it may grant
counsel's request to withdraw and dismiss the appeal
insofar as federal requirements are concerned, or
proceed to a decision on the merits, if state law so
requires.  On the other hand, if it finds any of the
legal points arguable on their merits (and therefore
not frivolous) it must, prior to decision, afford the
indigent the assistance of counsel to argue the
appeal."

368 U.S. at 744.

Here, AFPD Gray thoroughly and conscientiously reviewed
the record and determined that Ocampo had no issues to appeal.
Exhibit E at ¶ 15.  AFPD Gray so informed the Ninth Circuit,
filed a brief referencing the record regarding anything that
might arguably support Ocampo's appeal, and filed a motion to
withdraw as counsel of record.  Ocampo did not file a pro se
supplemental brief.

On December 6, 2006, the Ninth Circuit concluded that
their independent review of the record disclosed no grounds for
relief on direct appeal.  United States v. Ocampo, 207 F. App'x
756 (9th Cir. 2006).  The Ninth Circuit affirmed the District
Court's judgment and granted AFPD Gray's motion to withdraw as
counsel.  Thus, AFPD Gray fully complied with the requirements of
Anders.

36

3.    Ocampo Has Also Failed to Allege and Prove
      Prejudice as a Result of AFPD Gray's Performance

Even if AFPD Gray's performance fell below an objective standard of reasonableness, which it clearly did not, Ocampo has failed to prove prejudice as a result of any of his allegations of ineffectiveness.  As more fully addressed above, many, if not most, of Ocampo's allegations lack any factual basis.  Therefore, Ocampo cannot possibly claim to have suffered prejudice where his counsel's representation was objectively reasonable and effective.

D.    Ocampo's Requests for Relief Should be Summarily Denied

The relief Ocampo seeks includes:  (1) an order remanding his case to the district court to prove his claim of ineffective assistance of counsel; (2) an order remanding his case to the district court in order for his sentence to be vacated; (3) an evidentiary hearing; (4) appointment of counsel pursuant to 18 U.S.C. § 3006A(2)(B); and (5) any other relief the Court deems appropriate in the interest of justice.  Ocampo 2255 Memorandum at 23-24.

Ocampo is not entitled to any of the relief he seeks as he has failed to establish a prima facie case for any of his § 2255 claims, as established above.  In addition, § 2255 provides that a court shall hold an evidentiary hearing on a prisoner's § 2255 motion "unless the files and records of the

37

case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255.

The Ninth Circuit has held, however, that the standard for an evidentiary hearing is whether the prisoner has made specific factual allegations, which if true, state a claim on which relief can be granted. United States v. Schaflander, 743 F.2d 714, 717 (9th Cir. 1984), cert. denied, 470 U.S. 1058 (1985). Mere conclusory statements are insufficient to require an evidentiary hearing. Id. at 721. The allegations of the prisoner need not be accepted as true to the extent they are contradicted by the record in the case. United States v. Quan, 789 F.2d 711, 715 (9th Cir. 1986), cert. denied, 478 U.S. 1044 (1986); Shraiar v. United States, 736 F.2d 817, 818 (1st Cir. 1984). In addition, no hearing is required where the movant's allegations, when viewed against the records, either fail to state a claim for relief or are so palpably incredible as to warrant summary dismissal. Shah v. United States, 878 F.2d 1156, 1158 (9th Cir. 1989), cert. denied, 493 U.S. 869 (1989); Shaflander, 743 F.2d at 717; Quan 789 F.2d at 715.

In the instant case, the government submits that no evidentiary hearing is required because Ocampo has failed to make true and specific factual allegations. In addition, Ocampo's allegations consist of mere conclusory statements that fail to state a claim for relief.

38

Lastly, in the event an evidentiary hearing is ordered, the Supreme Court has held that there is no right to counsel for a collateral attack on a conviction. <u>Pennsylvania v. Finley</u>, 481 U.S. 551, 555 (1987). <u>See</u> <u>Sanchez v. United States</u>, 50 F.3d 1448, 1456 (9th Cir. 1995). Accordingly, Ocampo's request for the appointment of counsel should be denied.

IV. <u>CONCLUSION</u>

In the instant case, Ocampo has failed to make a <u>prima facie</u> case for any of his § 2255 claims. In addition, he has not articulated how counsel's performance was deficient and how counsel's alleged deficient representation prejudiced him. The allegations in Ocampo's § 2255 motion do not state a claim upon which relief can be granted. For the foregoing reasons, the United States requests that Ocampo's § 2255 motion be denied in its entirety without an evidentiary hearing.

DATED: _____11.30_____, 2007, at Honolulu, Hawaii.

EDWARD H. KUBO, JR
United States Attorney
District of Hawaii

By _____
BEVERLY WEE SAMESHIMA
Assistant U. S. Attorney
Attorneys for Plaintiff
UNITED STATES OF AMERICA