DECLARATION OF COUNSEL

I, Donna M. Gray, hereby state under penalty of perjury that the following is true and correct:

1. After his arrest on July 14, 2004, the Office of the Federal Public Defender ("FPD") was appointed to represent Mr. Ocampo and the case was assigned to William Domingo.

2. Discovery was provided to the FPD on August 16, 2004, and a copy of the discovery was mailed to Mr. Ocampo at the Federal Detention Center ("FDC").

3. I was assigned to this case on October 6, 2004, when Mr. Domingo left the FPD to go into private practice.

4. As is my practice, after I review a search warrant application and determine whether there are issues that can be raised, I ask another attorney in the office to review the warrant and give me their opinion. I did so in this case and the collective opinion was that the warrant could not be challenged.

5. I first met with Mr. Ocampo, along with an interpreter, at the FDC on October 20, 2004. At that meeting, I explained to Mr. Ocampo the seriousness of the charges against him and the statutory penalties, as well as how the sentencing guidelines are used to determine the exact sentence within the statutory minimum and maximum term. I explained to him that a mandatory minimum term

EXHIBIT E

could only be reduced by either application of the safety valve, or by substantial assistance to law enforcement. I also explained that in my opinion he had no defense to the case in light of the fact that he sold 2 ounces of "ice" (56.3 grams net weight) to an undercover Drug Enforcement Agency ("DEA") agent. Thus, he was best advised to plead guilty to the offense thereby reducing his guideline exposure by three levels.

6. I also informed Mr. Ocampo that I believed he would not qualify for the safety valve in light of the fact that his prior conviction record would place him, at a minimum, in criminal history category II.

7. I spoke with Mr. Ocampo about cooperation with law enforcement. He believed that he had already cooperated with law enforcement, but that he was willing to cooperate against Waldroupe and Makio. I told him that both of the co-defendants were already cooperating.

8. I believe Mr. Ocampo could never accept two facts: (1) that there was no way that the judge could legally sentence him to less than 10 years; and (2) that his guideline sentence would include the drug quantities found in the search of the hotel room that both

Waldroupe and Makio claimed Mr. Ocampo shared with them.

9. I explained the relevant conduct provisions of the guidelines and the law of conspiracy, but Mr. Ocampo felt that it was fundamentally unfair because the drugs in the hotel room did not belong to him, but belonged to the real drug dealer, co-defendant Waldroupe. I explained to Mr. Ocampo that the fact that during the 2 ounce sale on July 14, 2004, he was negotiating with the undercover agent for a future one pound sale to take place within five days, on July 19, 2004, made it near impossible to challenge the fact that the drugs found in the hotel room should not be considered as relevant conduct as to all members of the conspiracy.

10. I did not challenge the inclusion of the drugs found in the Miramar Hotel room in the calculation of the base offense level because I had no factual or legal grounds to do so.

11. Mr. Ocampo requested that I investigate certain discovery materials regarding reports signed by DEA Special Agent Michael Rothermund. Mr. Ocampo alleged that Special Agent Rothermund was under investigation for corruption. I was never able to verify this allegation. My investigation into the matter revealed

that Special Agent Rothermund's involvement in the case was limited to gathering evidence at the Miramar Hotel, specifically establishing the chain of custody of evidence seized upon execution of the federal search warrant on July 15, 2004. In my opinion, Special Agent Rothermund's involvement in Mr. Ocampo's case was tenuous and too ancillary to support a viable challenge or attempt to dismiss the charges against Mr. Ocampo. In addition, Special Agent Rothermund had no involvement in the two hand-to-hand methamphetamine sales Mr. Ocampo engaged in on July 13 and 14, 2004. Any attempt to dismiss the charges against Mr. Ocampo, based on Special Agent Rothermund's involvement, would not have succeeded in getting all charges against Mr. Ocampo dismissed.

12. I filed a response to the draft Presentence Report ("PSR") including Mr. Ocampo's denial that the drugs in the hotel room belonged to him. I also filed a sentencing memorandum asking Judge Seabright to sentence Mr. Ocampo below the 135-168 month guideline to the mandatory minimum term of 120 months.

13. Mr. Ocampo speaks Spanish, however, he sent me letters that were written in English. My recollection is that when I received a letter from Mr. Ocampo, I would

arrange to meet with Mr. Ocampo, along with an interpreter, at the FDC to discuss the matters raised in his letter.

14. From October 16, 2004, when I was first assigned to the case, until the day of Mr. Ocampo's sentencing, on April 6, 2006, I met with Mr. Ocampo, with the aid of an interpreter, a total of 16 times.

15. After judgment was entered, I met with Mr. Ocampo and he advised me that he wanted to file an appeal. I informed Mr. Ocampo that I did not believe he had any issues to appeal. I indicated that I would be filing an <u>Anders</u> brief.

The facts and statements set forth in the foregoing document are true and correct to the best of my knowledge and belief.

DATED: Honolulu, Hawaii, November 20, 2007.

DONNA M. GRAY
Assistant Federal Defender