IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| ARNULFO BARAJAS-OCAMPO, | ) | CIVIL NO.  07-00522 JMS/BMK |
| | ) | CR. NO.  04-00279 JMS |
| Petitioner, | ) | |
| | ) | ORDER DENYING OCAMPO'S |
| vs. | ) | (1) MOTION TO VACATE, SET |
| | ) | ASIDE, OR CORRECT SENTENCE |
| UNITED STATES OF AMERICA, | ) | UNDER 28 U.S.C. § 2255, AND |
| | ) | (2) MOTION FOR APPOINTMENT |
| Respondent. | ) | OF COUNSEL AND FOR |
| _____ | ) | EVIDENTIARY HEARING |

**ORDER DENYING OCAMPO'S (1) MOTION TO VACATE, SET ASIDE,
OR CORRECT SENTENCE UNDER 28 U.S.C. § 2255, AND (2) MOTION
FOR APPOINTMENT OF COUNSEL AND FOR
EVIDENTIARY HEARING**

Currently before the court is Petitioner Arnulfo Barajas-Ocampo's

("Ocampo" or "Petitioner") Motion to Vacate, Set Aside, or Correct his Sentence

Under 28 U.S.C. § 2255 ("Ocampo's § 2255 Motion"), and Motion for

Appointment of Counsel and for Evidentiary Hearing.  For the following reasons,

the Court DENIES both of Ocampo's motions.

## I.  BACKGROUND

### A.    The Offense Conduct

On July 28, 2004, Ocampo, John Michael Waldroupe ("Waldroupe"),

and Susan Darlene Makio ("Makio") were charged in a two-count Indictment with

(1) conspiracy to possess with intent to distribute 50 grams or more of

methamphetamine, its salts, isomers, and salts of its isomers, and (2) possession with intent to distribute 50 grams or more of methamphetamine, its salts, isomers, and salts of its isomers.

As described in the Presentence Investigative Report ("PSR"), the conduct underlying these charges includes the following: In July 2004, a cooperating source ("CS") provided information that Ocampo was distributing crystal methamphetamine in Honolulu, Hawaii.  PSR ¶ 10.  On July 12, 2004, the CS met with Ocampo, who stated that he regularly distributed pound quantities of methamphetamine.  Following investigators' instructions, the CS set up a meeting with Ocampo for a controlled purchase of methamphetamine on July 13, 2004 at Captain Zach's Bar in Honolulu.  *Id.* ¶ 11.  The CS and an undercover investigator ("UC") met Ocampo, who stated that he was in possession of approximately ten pounds of methamphetamine and also had access to heroin.  *Id.*  Ocampo left the bar to retrieve a drug "sample," and was seen entering and exiting the Ocean Resort Hotel.  Back at the bar, Ocampo presented the UC with a zip-lock bag containing 0.83 grams of d-methamphetamine hydrochloride.  *Id.*

On July 14, 2004, the CS contacted Ocampo to purchase two ounces of methamphetamine.  *Id.* ¶ 12.  Ocampo met the CS and UC at La Curcaracha Restaurant to complete the transaction.  Ocampo exchanged two zip-lock bags

containing what was later identified as 56.3 grams of d-methamphetamine

hydrochloride at 88% purity in exchange for $3,600 in prerecorded funds.

Ocampo further indicated that he had access to additional quantities of crystal

methamphetamine for sale/distribution.  *Id.*  Investigators then arrested Ocampo at

the restaurant.

       During a search of Ocampo, investigators found a hotel key for Room

2120 of the Miramar Hotel in Honolulu.  *Id.* ¶ 13.  On July 15, 2004, investigators

executed a federal search warrant on this room.  *Id.* ¶ 14.  In the room,

investigators found Makio, who confirmed that Ocampo had stayed the night there

with her and Waldroupe.  Investigators also recovered, among other things, a

digital scale, drug paraphernalia, a sock containing eight zip-lock bags of crystal

methamphetamine, and a bag containing two zip-lock bags of crystal

methamphetamine.  *Id.*  A Drug Enforcement Administration ("DEA") laboratory

later identified the recovered drugs from the hotel room as 217.3 grams of d-

methamphetamine hydrochloride at 91% purity, and 55.9 grams of d-

methamphetamine hydrochloride at 96% purity.  *Id.*

**B.**     **Hearing on Ocampo's Guilty Plea**

       On May 12, 2005, Ocampo, represented by Deputy Federal Public

Defender Donna Gray ("DFPD Gray"), entered a plea of guilty, without a plea

agreement, before Magistrate Judge Leslie E. Kobayashi to the two counts of the Indictment ("Change of Plea").  Ocampo affirmed that he had received a copy of the Indictment, discussed the charges and all the facts surrounding those charges with DFPD Gray, and understood the charges against him.  Gov. Ex. A 5-7.  In response to the question "Are you fully satisfied with the legal representation you've received from Ms. Gray as your lawyer," Ocampo answered "Yes."  *Id.*

The court explained to Ocampo that as to Count I, the government "has the burden of proving to a jury beyond a reasonable doubt that [Ocampo] conspired to distribute and to possess with the intent to distribute fifty grams or more of methamphetamine, its salts[,] . . . isomers, and salts of its isomers."  *Id.* at 6.  The court further explained that as to Count II, the government "has the burden of proving to a jury beyond a reasonable doubt that [Ocampo] possessed with the intent to distribute fifty grams or more of methamphetamine, its salts and salts of its isomers."  *Id.* at 7.  Ocampo affirmed that he understood the government's burden on each of these charges, that he waived his right to a jury determination of guilt, and that he was knowingly responsible for fifty grams or more of methamphetamine, its salts, isomers and salts of its isomers as charged in the Indictment.  *Id.* at 6-8.

Ocampo further affirmed that he understood the charges against him,

4

and that the charges carried a minimum term of ten years of imprisonment. *Id.* at

8.  The court explained, and Ocampo acknowledged, that the district judge may

determine Ocampo's sentence based on any admissions made during the Change

of Plea hearing, that he did not have to admit any facts that are in dispute with the

Government, and that Ocampo will be bound by his plea even if the court issues a

more severe sentence than he expects. *Id.* at 11.

Magistrate Judge Kobayashi then had the government "summarize the

essential elements that the Government would have to prove if this went to trial,"

*id.* at 13-15, and the "kind of evidence as to the facts that the Government would

offer at the time of trial." *Id.* at 15-18.  Turning to Ocampo, the court asked him to

explain in his own words what makes him guilty of these charges. *Id.* at 18.  In

addition to describing his meetings and sale to the UC, Ocampo admitted that the

drugs recovered in a black suitcase at the Miramar Hotel, totaling 217.3 grams of

d-methamphetamine hydrochloride, belonged to him, and that these drugs were

offered for sale. *Id.* at 21.  After finding that Ocampo "is fully competent and

capable of entering an informed and valid plea; that his plea of guilty is knowing

and voluntary and supported by an independent basis in fact containing each of the

essential elements of the offense charged against him," the court accepted

Ocampo's plea of guilty to each count of the Indictment. *Id.* at 23.

**C.     Sentencing**

        Ocampo was sentenced on April 6, 2006.  When questioned by the court, both DFPD Gray and Ocampo affirmed that they "had a full opportunity to read, review, and discuss the presentence report and the addendum and make any and all objections to the report that" they wished.  Gov. Ex. B 2.  DFPD Gray further stated that they had no objections to the guideline calculations, but had included a factual objection to provide Ocampo's explanation of his role.  Specifically, "[w]hat he disputed was Mr. Waldroupe's version that Mr. Waldroupe was completely innocent of that -- those particular drugs; whereas, Mr. Ocampo's position was all three of them possessed those drugs, all three of them intended to distribute it."  *Id.* at 3-4.  The court incorporated Ocampo's Response to the Draft Presentence Report into the PSR, and DFPD Gray agreed that the court need not make any factual findings.  *Id.* at 4.

        The court then adopted the PSR as the factual findings of the court, including the conclusions on the applicable guidelines.  *Id.* at 4-5.  The court explained that the charges carry a ten-year mandatory minimum, and an advisory guideline range of 135 to 168 months, which is based on a total offense level of 31, and criminal category III.  *Id.* at 5.

        DFPD Gray asked that the court sentence Ocampo to the mandatory

minimum of ten years, below the advisory guideline range. *Id.* In support of a

sentence below the guidelines, DFPD Gray explained:

> Your Honor, the overall reason I'm asking the court to
> consider reducing the advisory guideline to the minimum term
> is based upon Mr. Ocampo's alienage. . . . [I]f an inmate has a
> detainer placed upon him, as does Mr. Ocampo, he will not be
> eligible for the incentives connected to [a drug treatment
> program], which are a possible sentence reduction of up to one
> year and additional halfway house prerelease time. There's
> also statutory prerelease time that people with detainers are not
> eligible for either.
> . . .
> Ten years is an enormous consequence. He will face
> disadvantages within the federal prison system because of his
> alienage and the detainer that has been placed upon him, and he
> will be immediately turned over to the Immigration Service
> upon completion of his term for deportation and exclusion from
> this country.
>
> So in looking at all the factors under 3553 and the
> purposes of sentencing, I'd ask the court to reduce the
> minimum -- or the low end of the guideline, which is 135
> months, by 15 months to the mandatory minimum term of 120
> months.

*Id.* at 7-9.

Considering the 18 U.S.C. § 3553(a) factors and based on a review of

the PSR, the letters submitted on Ocampo's behalf, DFPD Gray's Sentencing

Memorandum, and the argument at the hearing, the court sentenced Ocampo on

each count to concurrent 135 month terms of imprisonment, and concurrent five-

year terms of supervised release. *Id.* at 11-14. In determining Ocampo's sentence,

the court stated that it "probably would have gone higher than the 135 months, but I think some of the arguments Miss Gray makes have some merit to them. They don't, I think, convince me sufficiently to go outside the guidelines range in this case but do convince me to go to the bottom of the guideline range in this case." *Id.* at 11-12.

## D.    Appeal

After judgment was entered, Ocampo informed DFPD Gray that he wanted to file an appeal. DFPD Gray Decl. ¶ 15. In response, DFPD Gray "informed Mr. Ocampo that I did not believe he had any issues to appeal. I indicated that I would be filing an *Anders* brief." *Id.* DFPD Gray asserts that she had made a conscientious review of the record, and determined that an appeal would be frivolous and that there were no issues to appeal. Ocampo Ex. Q.

After making this determination, DFPD Gray filed an *Anders* brief. After performing an independent review of the record, the Ninth Circuit determined that there were "no grounds for relief on direct appeal." *United States v. Ocampo*, 207 Fed. Appx. 756 (9th Cir. 2006).

///

///

///

8

**E.     Ocampo's § 2255 Motion**

On October 15, 2007, Ocampo filed his § 2255 Motion.[1]  On October

26, 2007, the United States filed a Motion for Order Finding Waiver of Attorney-

Client Privilege with Respect to Ocampo's § 2255 Motion, which the court

granted on October 29, 2007.  The United States then filed its Opposition on

November 30, 2007.  On February 19, 2008, Ocampo filed a Reply,[2] and Motion

for Appointment of Counsel and for Evidentiary Hearing.

## II.  ANALYSIS

Ocampo provides a laundry list of reasons why he is entitled to relief,

including that: (1) the Indictment was defective; (2) judicial violations occurred

during the Change of Plea; (3) judicial violations occurred during sentencing;

(4) Ocampo was deprived the right to a speedy trial; and (5) DFPD Gray provided

ineffective assistance of counsel.  Ocampo further requests an evidentiary hearing

and the appointment of counsel.  The court first addresses Ocampo's request for an

---

[1]  The courtesy copy of Ocampo's memorandum in support of his § 2255 Motion (Docket No. 123) differed from the version that was originally filed (Docket No. 113).  To the extent that the two memoranda do not overlap, the court addresses all of their arguments.  Unless otherwise noted, however, page numbers provided in this Order are from Docket No. 113.

[2]  Ocampo requested two extensions to file a Reply, on the basis that he is proceeding pro se and not versed in the law, and requires English to Spanish translation of the papers.  The court granted Ocampo's requests, allowing him until February 11, 2008 to file a Reply.  Doc. Nos. 122 & 125.

evidentiary hearing, and, after finding that one is not necessary, addresses the merits of Ocampo's § 2255 Motion.

## A.     Appointment of Counsel and Evidentiary Hearing

The Sixth Amendment's right to counsel does not apply in habeas corpus actions.  Rather, 18 U.S.C. § 3006A(a)(2)(b) allows the appointment of counsel for a § 2255 motion where: (1) the person is financially eligible for appointment of counsel and (2) the interests of justice require the appointment of counsel.  "Unless an evidentiary hearing is required, the decision to appoint counsel is within the discretion of the district court."  *Knaubert v. Goldsmith*, 791 F.2d 722, 728 (9th Cir. 1986).

A court should hold an evidentiary hearing on a § 2255 motion "unless the files and records of the case conclusively show that the prisoner is entitled to no relief."  28 U.S.C. § 2255; *see also United States v. Keller*, 902 F.2d 1391, 1395 (9th Cir. 1990) ("To warrant an evidentiary hearing, a petitioner must 'make specific factual allegations which, if true, would entitle him to relief.'") (*quoting Baumann v. United States*, 692 F.2d 565, 571 (9th Cir. 1982)).  In the Ninth Circuit, this standard requires an evidentiary hearing where "the movant has made specific factual allegations that, if true, state a claim on which relief could be granted."  *United States v. Schaflander*, 743 F.2d 714, 717 (9th Cir. 1984).  A

10

hearing is not necessary if the "allegations, when viewed against the record, do not state a claim for relief or are so palpably incredible or patently frivolous as to warrant summary dismissal." *United States v. Leonti*, 326 F.3d 1111, 1116 (9th Cir. 2003) (*citing Schaflander*, 743 F.2d at 717) (internal quotation signals omitted); *see also United States v. Donn*, 661 F.2d 820, 825 (9th Cir. 1981) (Only when the petitioner has "made reasonably plausible factual allegations that state a claim on which relief could be granted" must the court hold a hearing.). Conclusory statements in a § 2255 motion are insufficient to require a hearing. *United States v. Johnson*, 988 F.2d 941, 945 (9th Cir. 1993).

After a careful review of the record, the court finds it appropriate to rule on Ocampo's § 2255 Motion without an evidentiary hearing. As explained below for each of his arguments, Ocampo has failed to make any specific factual allegations which, if true, would entitle him to relief. Accordingly, an evidentiary hearing is not necessary. The court further finds that the interests of justice do not require the appointment of counsel. Ocampo was able to present his arguments to the court, and was provided additional time due to his pro se status and need for English-to-Spanish translation. It does not appear that the appointment of counsel would further Ocampo's position here.

**B.    Alleged Problems in the Indictment**

**1.    *Failure to Refer to 18 U.S.C. § 2***

Ocampo argues that the Indictment was "constitutionally defective" because it did not charge him with violation of 18 U.S.C. § 2.  Ocampo Aff. ¶ 5.

"Section 2(a) of Title 18 does not define a separate offense but rather makes it unlawful to aid or abet another in the commission of a substantive offense."  *United States v. Ramirez-Martinez*, 273 F.3d 903, 911 (9th Cir. 2001) (*overruled on other grounds by United States v. Lopez*, 484 F.3d 1186 (9th Cir. 2007)).  Thus, "aiding and abetting is embedded in every federal indictment for a substantive crime."  *United States v. Garcia*, 400 F.3d 816, 820 (9th Cir. 2005) (*citing Ramirez-Martinez*, 273 F.3d at 911; *United States v. Gaskins*, 849 F.2d 454, 459 (9th Cir. 1988) (noting that "all indictments for substantive offenses must be read as if the alternative provided by 18 U.S.C. § 2 were embodied in the indictment") (internal quotation marks and citations omitted); *and United States v. Armstrong*, 909 F.2d 1238, 1241 (9th Cir. 1990) ("Aiding and abetting is implied in every federal indictment for a substantive offense[,]" even though the elements necessary to convict as a principal and as an aider and abettor are different.)).  Accordingly, the Indictment's failure to recite a violation of 18 U.S.C. § 2 did not render it constitutionally defective.

2.     *Failure to Have Laboratory Results of Recovered Drugs at Time of Indictment*

Ocampo argues that the government misled the grand jury because it had not completed the laboratory tests identifying the recovered drugs until after the grand jury indicted him. *See* Ocampo Aff. ¶ 8. The court rejects this argument on two grounds.

First, the government need not present a DEA laboratory report to establish probable cause that the seized substances were in fact methamphetamine. Lesser evidence, such as a field-test report, would suffice. Because Ocampo has not claimed that the government presented the grand jury with no evidence regarding the nature of the seized substance -- only that the DEA laboratory report (signed August 11, 2004) could not have been presented to the grand jury (which returned its Indictment on July 28, 2004) -- the lack of a DEA laboratory report on July 28, 2004 does not undermine the grand jury's finding of probable cause.

Second, to the extent there was any error, such error was harmless. "Under Supreme Court precedent, most errors in grand jury proceedings are reviewed for harmless error." *United States v. Omer*, 429 F.3d 835, 840 (9th Cir. 2005); *see id.* (*citing Bank of Nova Scotia v. United States*, 487 U.S. 250, 254 (1988 ("We hold that, as a general matter, a district court may not dismiss an

13

indictment for errors in grand jury proceedings unless such errors prejudiced the

defendants."); *and United States v. Mechanik*, 475 U.S. 66, 70 (1986) (same)).

For example, a jury's conviction generally renders errors in the indictment

harmless -- "the petit jury's subsequent guilty verdict means not only that there

was probable cause to believe that the defendants were guilty as charged, but also

that they are in fact guilty as charged beyond a reasonable doubt." *Mechanik*, 475

U.S. at 70.

Courts have applied this same reasoning to a conviction achieved

through a plea of guilty. *See Tollett v. Henderson*, 411 U.S. 258, 267 (1973) ("A

guilty plea represents a break in the chain of events which has preceded it in the

criminal process.  When a criminal defendant has solemnly admitted in open court

that he is in fact guilty of the offense with which he is charged, he may not

thereafter raise independent claims relating to the deprivation of constitutional

rights that occurred prior to the entry of the guilty plea."); *Alston v. Ricks*, 2003

WL 42144, at *7 (S.D.N.Y. Jan. 7, 2003) ("[A] guilty plea extinguishes the ability

of a habeas petitioner to raise a claim regarding misconduct before a grand jury.");

*United States v. Tiedemann*, 1997 WL 587255, at *6 (E.D. Pa. Sept.12, 1997)

("[T]he defendant cannot challenge the grand jury proceedings in a habeas action,

after a plea of guilty." (citations omitted)); *Lloyd v. Walker*, 771 F. Supp. 570,

576-77 (E.D.N.Y. 1991) ("Having admitted to the factual basis of the charges against him upon entering a plea of guilty, any error in the proceeding which led to his Indictment is . . . rendered harmless, and is not a cognizable claim in a federal habeas proceeding." (internal citation omitted)); *Ballard v. Costello*, 2001 WL 1388297, at *2 (E.D.N.Y. Nov. 2, 2001) ("[Petitioner's] guilty pleas cured any possible deficiencies in the grand jury proceeding." (citations omitted)).

Ocampo pled guilty to both counts of the Indictment. Further, the laboratory results referenced in the presentence report confirmed the amount and purity of the drugs either sold by Ocampo or found in the hotel room. To the extent there was any error in the government not presenting the laboratory results to the grand jury, such error was harmless.

## C.     Alleged Rule 11 Violations During the Change of Plea

### 1.     *The Use of Different Terms to Describe "Methamphetamine, its Salts, Isomers, and Salts of its Isomers" During the Change of Plea*

Ocampo argues that the government and court violated Federal Rule of Criminal Procedure 11 "because the court and the prosecutor made ambiguous statements at defendant's hearing upon the type, quantity, and purity of the drug in the offense for sentencing purposes," resulting in him not being informed of the amount of drugs relevant for his offense level. Ocampo Mot. 13-14. Ocampo

further argues that he was not informed that three different types of drugs -- "d-methamphetamine hydrochloride," "methamphetamine," and "ice," -- would be added together for purposes of sentencing.  Ocampo Mot. 7; *see also id.* at 20 (arguing that it was not "explained that the type of drug charged in the Indictment would be 'changed' at sentencing by 'ice,' that would increase his offense level, even, when defendant pled guilty for the counts charged in the Indictment and stated by the court at the plea colloquy for 50 grams or more of 'methamphetamine'").  Ocampo's arguments lack merit.

The two-count Indictment charged Ocampo with (1) conspiracy to possess with intent to distribute 50 grams or more of methamphetamine, its salts, isomers, and salts of its isomers, and (2) possession with intent to distribute 50 grams or more of methamphetamine, its salts, isomers, and salts of its isomers.  In this case, "methamphetamine, its salts, isomers, and salts of its isomers" is an umbrella term than encompasses "d-methamphetamine hydrochloride," "methamphetamine," and "ice."  Stated differently, "d-methamphetamine hydrochloride," "methamphetamine," "ice," and "methamphetamine, its salts, isomers, and salts of its isomers" all refer to the same drug for the purposes of the charges against Ocampo.  *See* 21 U.S.C. § 812(c), Schedule III(a)(3) (defining a Schedule III substance as "[a]ny substance (except an injectable liquid) which

contains any quantity of methamphetamine, including its salts, isomers, and salts

of isomers");[3] U.S.S.G. § 2D1.1(c), n.(C) (defining "ice" as "a mixture or

substance containing d-methamphetamine hydrochloride of at least 80% purity");

*see also United States v. Blake*, 116 F.3d 1202, 1202-03 (7th Cir. 1997) (rejecting

argument that "only methamphetamine that is 'pure' in the hands of the distributor

counts as 'methamphetamine, its salts, isomers, and salts of its isomers' for

purposes of the statute," and noting that "[f]our courts of appeals have rejected

this contention, whether made directly or rephrased as a contention that the statute

is ambiguous enough to activate the Rule of Lenity").

Because these terms all refer to the same drug for purposes of

sentencing, the court finds that no ambiguity in the Change of Plea or error in

adding these amounts for purposes of sentencing.  During the Change of Plea,

Ocampo acknowledged that he is knowingly responsible for fifty grams or more of

methamphetamine, its salts, isomers, and salts of its isomers as charged in each

count of the Indictment.  Neither the court nor the government's later use of the

terms "methamphetamine," "d-methamphetamine hydrochloride," and "ice"

inserted any ambiguity regarding Ocampo's relevant conduct and the scope of the

---

[3] Although Congress initially placed methamphetamine in Schedule III, the Attorney General subsequently reclassified "methamphetamine, its salts, isomers, and salts of its isomers" as a Schedule II controlled substance. *See* 21 C.F.R. § 1308.12(d).

charges against him. Simply put, there is no real question that these terms all refer to the same drug for purposes of the charges in the Indictment. Ocampo freely answered the court's questions and never voiced any lack of understanding.

The court also rejects Ocampo's argument that he was not informed during his Change of Plea of the amount of drugs that would be considered as relevant conduct. First, a court need not inform a defendant during a plea proceeding that his sentence may be enhanced by relevant conduct. *See United States v. Watson*, 988 F.2d 544, 553 (5th Cir. 1993). Second, even if such a requirement did exist, under the facts of this case, Ocampo was informed and admitted to the drug quantities that resulted in a base offense level 34 under Guideline § 2D1.1. Ocampo admitted that he sold 56.3 grams of d-methamphetamine hydrochloride to a UC on July 13, 2004, and that the black suitcase found at the Miramar Hotel containing 217.3 grams of d-methamphetamine hydrochloride belonged to him. Ocampo Mot. 20-21. Given these facts, the court finds no ambiguity during the Change of Plea.[4]

---

[4] Ocampo was not questioned about the other 55.9 grams of methamphetamine found in the Miramar Hotel. However, even if these drugs were not attributable to Ocampo, any error was harmless because exclusion of this amount would not change Ocampo's base offense level under the Sentencing Guidelines. *See United States v. Garro*, No. 06-50513, at 1792 (9th Cir. Feb. 28, 2008); U.S.S.G. § 2D1.1(c)(4) (providing a base offense level of 34 for offenses involving at least 150 grams but less than 500 grams of methamphetamine).

**2.** ***The Government's Recital of the Elements of the Charges and Evidence to be Presented at Trial***

Ocampo argues that the court violated Federal Rule of Criminal Procedure 11 by having the government describe the evidence that it would offer at the time of trial to support each charge of the Indictment. Ocampo Mot. 20.

Federal Rule of Criminal Procedure 11 requires that the court, in accepting a guilty plea, "inform the defendant of, and determine that the defendant understands . . . the nature of each charge to which the defendant is pleading." Fed. R. Crim. P. 11(b)(1)(G). Regarding a potential sentence, the court must inform a defendant of any maximum possible penalty, as well as any mandatory minimum sentence. Fed. R. Crim. P. 11(b)(1)(H) & (I). The court must also find that there is a factual basis for the guilty plea. Fed. R. Crim. P. 11(b)(3).

"'[R]eal notice of the true nature of the charge against [a defendant is] the first and most universally recognized requirement of due process.'" *United States v. Minore*, 292 F.3d 1109, 1115 (9th Cir. 2002) (*quoting Bousley v. United States*, 523 U.S. 614, 618 (1998)).

> The requirement serves two functions. First, a defendant's admission of criminal culpability is not meaningful unless the defendant understands the crime to which he is confessing. Notice of the nature of the charge is required to obtain a knowing and intelligent guilty plea. . . . Second, informing the defendant of the nature of the charge against him ensures that

19

> the defendant thoroughly understands that if he pleads "not guilty" the State will be required to prove certain facts, thus permitting the defendant to make an intelligent judgment as to whether he would be better off accepting the tendered concessions or chancing acquittal if the prosecution cannot prove those facts beyond a reasonable doubt.

*Id.* (citations and quotation signals omitted).

Here, Magistrate Judge Kobayashi asked, and Ocampo affirmed, that he understood each of the charges against him.  Gov. Ex. A 5-7.  The government then summarized "the essential elements that [it] would have to prove if this went to trial."  *Id.* at 13-15.  Ocampo affirmed his understanding that "if there were a trial on the charges, the government would have to bring evidence to prove each of those elements beyond a reasonable doubt."  *Id.* at 15.  The government then summarized the "kind of evidence as to the facts that the Government would offer at the time of trial."  *Id.* at 15-18.  Finally, the court asked Ocampo to state in his own words what it is that he did that makes him guilty of each charge.  *Id.* at 18. The court then questioned Ocampo to establish a factual basis for his plea.  *Id.* at 18-23.

Because Magistrate Judge Kobayashi ensured that Ocampo understood the nature, elements, and factual basis of the two charges against him, there was no violation of Rule 11.  That the government, as opposed to the court,

recited the actual elements of each charge and the factual predicate for each element of each charge, does not change this finding.

**D.      The Amount of Drugs Attributable to Ocampo for Sentencing**

While not entirely clear from his § 2255 Motion, Ocampo appears to argue that the court improperly imposed a higher sentence than the drug amounts attributable to him would require and that the "court rejected to enforce Defendant's plea."[5]  Ocampo Mot. 21.  The court first addresses the amount of drugs attributable to Ocampo, and then explains why Ocampo's sentence was not in error.

"In sentencing a defendant convicted of conspiracy to distribute a controlled substance, a district court may not automatically count as relevant conduct the entire quantity of drugs distributed by the conspiracy."  *United States v. Banuelos*, 322 F.3d 700, 704 (9th Cir. 2003) (*citing United States v. Garcia-Sanchez*, 189 F.3d 1143, 1147 (9th Cir. 1999)); *see* U.S.S.G. § 1B1.3(a)(1)(B) (describing the relevant conduct for determining the guideline

---

[5]   Ocampo also states that "the court failed to inquiry [sic] the plea colloquy to know the facts of defendant's plea guilty.  The court rested on the presentence report to impose its sentence in Ocampo's case.  The record shows that sentencing judge incorporated Ms. Gray's sentencing statement on the issue of downward departure for defendant's alienage, the PSR, some letters submitted, 18 U.S.C. § 3553(a) and of course the guidelines."  Ocampo Mot. 21.  While unclear what Ocampo argues here, the court finds that its procedure during sentencing complied with Federal Rule of Criminal Procedure 32.

range for conspiracy to commit an offense). "Rather, the court must find the quantity of drugs that either (1) fell within the scope of the defendant's agreement with his coconspirators or (2) was reasonably foreseeable to the defendant." *Banuelos*, 322 F.3d at 704 (*citing United States v. Gutierrez-Hernandez*, 94 F.3d 582, 585 (9th Cir. 1996)).

Here, during a July 13, 2004 meeting, Ocampo told the CS and UC that he was in possession of approximately ten pounds of methamphetamine and also had access to heroin. PSR ¶ 11. Ocampo then provided a "drug sample" of a zip-lock bag containing 0.83 grams of d-methamphetamine hydrochloride. *Id.* On July 14, 2004, Ocampo sold the UC two zip-lock bags containing what was later identified as 56.3 grams of d-methamphetamine hydrochloride at 88% purity. *Id.* ¶ 12. During this second meeting, Ocampo again indicated that he had access to additional quantities of crystal methamphetamine for sale/distribution. *Id.* A subsequent search of a hotel room for which he had a key recovered 217.3 grams of d-methamphetamine hydrochloride at 91% purity, and 55.9 grams of d-methamphetamine hydrochloride at 96% purity. *Id.* ¶ 14.

Based on these facts, there was no error in basing Ocampo's sentencing on not only the amounts of methamphetamine he sold to the UC, but also the amounts found in the hotel room. While Ocampo did not rent the hotel

22

room in which the larger amounts of methamphetamine were found, he stayed

there the night before he was arrested, and represented to the UC that he could sell

larger amounts of methamphetamine.  Accordingly, the amounts found in the hotel

room fell within the scope of Ocampo's agreement with his coconspirators and/or

was reasonably foreseeable to the defendant.  Indeed, at the Change of Plea,

Ocampo admitted to selling the 56.3 grams to the UC, and that the 217.3 grams

found in the hotel room belonged to him.  Gov. Ex. A 21.

The court also rejects Ocampo's argument that his sentence violated a

plea agreement.  There was no promise or agreement between Ocampo and the

government.[6]  *See* Gov. Ex. B 2-3 (stating that "Mr. Ocampo pled guilty to counts

1 and 2 of the indictment without a plea agreement").  As discussed above, it is

true that the actual charges recite an amount of methamphetamine of "50 grams or

more," but there was no representation that his *sentence* would be based on a

smaller amount of methamphetamine.  Defendant's reliance on *Santobello v. New

York*, 404 U.S. 257, 262 (1971), which states that "when a plea rests in any

significant degree on a promise or agreement of the prosecutor, so that it can be

said to be part of the inducement or consideration, such promise must be fulfilled,"

---

[6] The court likewise rejects as baseless Ocampo's argument that Magistrate Judge
Kobayashi improperly participated in "Defendant's oral plea agreement discussions."  *See*
Ocampo Reply 14.

has no application here.

**E.     Delay in Trial**

Ocampo argues that the delay between his Indictment and Change of Plea violated the Speedy Trial Act, 18 U.S.C. § 3161.  The court rejects this argument.

The Speedy Trial Act provides that a criminal defendant's trial must generally commence within 70 days of the filing of the indictment or the defendant's initial court appearance, whichever is later.  18 U.S.C. § 3161(c)(1).  Certain periods of delay are excluded from the calculation of the 70-day limit, including:

> Any period of delay resulting from a continuance granted by any judge on his own motion or at the request of the defendant or his counsel or at the request of the attorney for the Government, if the judge granted such continuance on the basis of his findings that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial.

*Id.* § 3161(h)(8)(A).  The Ninth Circuit has "held that in order to comply with the Speedy Trial Act the district court must satisfy two requirements whenever it grants an 'ends of justice' continuance: (1) the continuance must be 'specifically limited in time'; and (2) it must be 'justified [on the record] with reference to the facts as of the time the delay is ordered.'"  *United States v. Lloyd*, 125 F.3d 1263,

1268 (9th Cir. 1997) (*quoting United States v. Jordan*, 915 F.2d 563, 565-66 (9th

Cir. 1990)).  A court must state "specific factual circumstances" that justify a

continuance.  *Id.*

          Ocampo made his initial appearance on July 15, 2004, and the

Indictment was returned by the grand jury on July 28, 2004.  He was then

arraigned on the Indictment on July 30, 2004, and his trial date was scheduled for

September 28, 2004.  Pursuant to § 3161(c)(1), the time for the 70-day speedy trial

clock started on July 28, 2004.  On August 30, 2004, Ocampo, co-defendant

Makio, and the government stipulated that the trial date be continued from

September 28, 2004 to January 11, 2005.  Gov. Ex. C.  The stipulation stated that

"additional time is needed to prepare" and "[t]he ends of  justice are best served by

granting the continuance in this matter and that the ends of justice served by the

continuance outweigh the interest of the defendants and the public in a speedy

trial."  *Id.*

          On December 9, 2004, the parties further stipulated to continue the

trial date from January 11, 2005 until June 1, 2005.  Gov. Ex. D.  Like the

previous one, this stipulation stated that "[t]he ends of justice served by continuing

the trial from January 11, 2005 to June 1, 2005 outweigh the best interest of the

public and the defendant in a speedy trial."  *Id.*  This stipulation also explained

that Defendant needed additional time to prepare for trial and obtain "needed

information and prepare for appropriate pretrial motions and trial." *Id.* Finally,

the stipulation provided that the "the period of time from January 11, 2005 up to

and including June 1, 2005, is excludable for purposes of computing time under

the Speedy Trial Act." *Id.* Judge David Alan Ezra signed both stipulations.

Gov. Exs. C & D.

        Ocampo argues that the time period covered by the two continuances

should not be excluded from the speedy trial calculation because the court never

made a finding that the ends of justice were served by granting each continuance.

*See* Ocampo Mot. 19. If both stipulations toll the Speedy Trial clock under 18

U.S.C. § 3161(h)(8)(A), the time period between the first trial date on September

28, 2004 and his Change of Plea on May 12, 2005 is excluded and there is no

violation of Ocampo's Speedy Trial rights.[7] The first stipulation, however, does

not provide specific reasons for the continuance, or specify that the parties

stipulate that the extension shall be excluded for purposes of computing time

under the Speedy Trial Act. To the extent the first stipulation is deficient, Ocampo

---

[7] The only period that would count toward the 70-day calculation would be July 28, 2004 until the first trial date, September 28, 2004. This period, a total of 62 days, is within the 70-day Speedy Trial clock.

may have had a basis for objection.[8]  The court need not make this determination,

however, because Ocampo has waived his right to make this argument here.

18 U.S.C. § 3162(a)(2) provides that "[f]ailure of the defendant to

move for dismissal prior to trial or entry of a plea of guilty or nolo contendere

shall constitute a waiver of the right to dismissal under [the Speedy Trial Act]."

"The Act provides for no exception to the waiver of the right to dismissal for

failure to make a timely motion."  *United States v. Brickey*, 289 F.3d 1144, 1150

(9th Cir. 2002) (*citing United States v. Westbrook,* 119 F.3d 1176, 1184 (5th Cir.

1997)).

Neither DFPD Gray nor Ocampo moved for a dismissal of the

Indictment for violation of the Speedy Trial Act, and Ocampo's § 2255 Motion is

the first time he raised this argument.  Because Ocampo has waived his right to

raise a speedy trial violation, the court rejects his argument.

## F.     DFPD Gray's Representation of Ocampo

The Sixth Amendment guarantees the right to effective assistance of

counsel at all critical stages of a criminal proceeding, including sentencing.

*United States v. Gonzalez*, 113 F.3d 1026, 1029 (9th Cir. 1997).  A petitioner

---

[8] In section III(F)(3), the court addresses whether DFPD Gray's failure to raise such an objection constitutes ineffective assistance of counsel.

demonstrates ineffective assistance of counsel by showing that: (1) his counsel's performance was objectively deficient, and (2) the deficient performance prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668 (1984).

Counsel "is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 690-91.

Even after showing that counsel's performance is deficient, in order to constitute ineffective assistance under the Constitution, the petitioner must show that such deficiency was prejudicial to the defense. *Id.* at 692. Stated differently, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

### 1.     *Representation Prior to Change of Plea*

Ocampo argues that DFPD Gray provided ineffective assistance of counsel in a number of ways throughout the pretrial process, which ultimately

affected his plea and sentencing.

First, Ocampo argues that he requested discovery from DFPD Gray, but that DFPD Gray instead sought "help for [the] government to arrest more people." Ocampo Mot. 2. The evidence presented, however, indicates that the Federal Public Defender mailed the discovery it received from the government to Ocampo. *See* DFPD Gray Decl. ¶ 2. Further, in meeting with Ocampo, DFPD Gray explained that she believed he had no defense given that he sold two ounces of methamphetamine to the UC. *Id.* ¶ 5. DFPD Gray therefore counseled Ocampo that he could reduce his likely sentence by pleading guilty to the charges, and/or providing substantive assistance to the government. *Id.* Under the facts supporting the charges against Ocampo, DFPD Gray's focus on determining whether Ocampo could provide assistance to the government was not objectively deficient. *See also Yarborough v. Gentry*, 540 U.S. 1, 5 (2003) ("When counsel focuses on some issues to the exclusion of others, there is a strong presumption that he did so for tactical reasons rather than through sheer neglect." (*citing Strickland*, 466 U.S. at 690)).

Second, Ocampo argues that DFPD Gray did not adequately investigate Ocampo's assertions that one of the agents involved in his case, Michael Rothermund, was under investigation for corruption. Ocampo Mot. 2-4.

Ocampo asserts that he gave DFPD Gray information that "some persons that were arrested at the same place [as] Barajas-Ocampo in a drug conspiracy were dismissed of their charges" due to this issue. *Id.* at 2. Ocampo alleges that DFPD Gray lied to Ocampo by informing him that this issue would not help, and points to discovery documents that indicate that Rothermund signed "Reports of Drug Property Collected, Purchased, or Seized" from the search of the Miramar Hotel room. Ocampo Ex. D.

In spite of Ocampo's allegations and discovery documents, DFPD Gray's decisions were not objectively deficient. DFPD Gray investigated, but was unable to verify, whether Rothermund was under investigation for corruption. DFPD Gray Decl. ¶ 11. DFPD Gray further found that Rothermund's involvement "was limited to gathering evidence at the Miramar Hotel, specifically establishing the chain of custody of evidence seized upon execution" of the search warrant. *Id.* Rothermund had no involvement in Mr. Ocampo's sales of methamphetamine to the UC.[9] *Id.* Based on this evidence, DFPD Gray concluded that "Rothermund's involvement in Mr. Ocampo's case was tenuous and too ancillary to support a

_____

[9] Ocampo argues that Rothermund had a larger role because he participated in Waldroupe's arrest, and that Waldroupe stated that all of the drugs found in the hotel room were Ocampo's. These facts do not rebut DFPD Gray's reasonable investigation and finding that information on Rothermund would not support a challenge to Ocampo's charges. Indeed, as discussed above, Ocampo admitted that much of the drugs found the hotel room belonged to him.

viable challenge or attempt to dismiss the charges against Mr. Ocampo." *Id.*  The

court therefore finds that by determining that any alleged corruption charges

against Rothermund would not help Ocampo's case, DFPD Gray fulfilled her

"duty to make reasonable investigations or to make a reasonable decision that

makes particular investigations unnecessary." *See Strickland*, 466 U.S. at 691.

Third, Ocampo alleges that DFPD Gray committed several errors

regarding his Indictment including that DFPD Gray: (1) did not recognize that

Ocampo was not charged for violating 18 U.S.C. § 2, (2) never reviewed the

Indictment with Ocampo, (3) never explained the nature of the elements of the

charged offenses, and (4) never identified the type of drug involved in the offense.

Each of these arguments lacks merit.

As discussed *supra*, the Indictment's failure to reference 18 U.S.C.

§ 2 did not render it constitutionally defective.  Thus, DFPD Gray committed no

error in failing to raise this argument with the court.  Further, the record rebuts

each of Ocampo's assertions that DFPD Gray never provided Ocampo the

Indictment, explained the nature of the elements of the charged offenses, or

identified the type of drug involved in the offense.[10]  During the Change of Plea,

---

[10]  Ocampo, for the first time in his Reply, argues that DFPD Gray did not move to
withdraw his guilty plea as instructed.  *See* Ocampo Reply 16.  The court will not consider

(continued...)

Ocampo affirmed that he received a copy of the Indictment, and had discussed the

charges and all facts surrounding those charges with DFPD Gray.  Gov. Ex. A 5;

*see also* DFPD Gray Decl. ¶ 5 (stating that she "explained to Mr. Ocampo the

seriousness of the charges against him and the statutory penalties, as well as how

the sentencing guidelines are used to determine the exact sentence within the

statutory minimum and maximum term").  Ocampo's statements at the Change of

Plea "carry a strong presumption of veracity in subsequent proceedings attacking

the plea," and rebuts his argument for ineffective assistance of counsel.  *United*

*States v. Ross*, 511 F.3d 1233, 1236 (9th Cir. 2008).  In sum, the court finds that

each of Ocampo's arguments lacks merit.

### 2.     *Change of Plea*

Ocampo makes two arguments that DFPD Gray provided ineffective

assistance of counsel at his Change of Plea.

---

[10](...continued)
arguments raised for the first time in a Reply.  Even if the court did allow this argument,
however, Ocampo has set forth no basis for setting aside his guilty plea.  Federal Rule of
Criminal Procedure 11(d)(2)(B) provides that a defendant may withdraw from a plea of guilty
before sentencing if "the defendant can show a fair and just reason for requesting the
withdrawal."  "Fair and just reasons for withdrawal include inadequate Rule 11 plea colloquies,
newly discovered evidence, intervening circumstances, or any other reason for withdrawing the
plea that did not exist when the defendant entered his plea."  *See United States v.*
*Ortega-Ascanio*, 376 F.3d 879, 883 (9th Cir. 2004).  Ocampo has provided no facts that would
have supported a basis to withdraw his guilty plea, and as discussed above, Magistrate Judge
Kobayashi ensured that Ocampo understood the nature, elements, and factual basis of the two
charges against him, as well as the potential sentence the charges carried.

First, Ocampo appears to argue that DFPD Gray forced his responses during the Change of Plea because she told him that the only way to get a lesser sentence would be to "follow her direction and respond to the court . . . ." Ocampo Mot. 5. Because Ocampo has not identified any questions he did not understand or responses that he would have changed, the court rejects this argument on this basis alone. Further, the court directly questioned Ocampo under oath, and directed him to answer the questions freely and voluntarily. Gov. Ex. A 2-3. Accordingly, even if DFPD Gray did tell Ocampo to "follow her direction," Ocampo has failed to show that such conduct prejudiced Ocampo.

Second, Ocampo argues that DFPD Gray provided ineffective assistance of counsel by not objecting at the plea colloquy. As discussed above, the plea colloquy did not violate Rule 11, and was unambiguous regarding the type and amounts of drug at issue and the potential sentence. DFPD Gray's failure to object was not improper. *See Baumann*, 692 F.2d at 571-72 (stating that attorney's failure to raise meritless legal argument does not constitute ineffective assistance of counsel).

### 3. *Speedy Trial Violation*

Ocampo argues that DFPD Gray failed to seek a speedy trial when she sought and received a continuance for the change of plea from April 20, 2005

33

to May 12, 2005, and failed to raise the speedy trial violation.  Ocampo Mot. 4.

        The facts as admitted by Ocampo establish that DFPD Gray's request for a continuance for the Change of Plea proceeding was proper.  Just prior to his scheduled change of plea on April 20, 2005, "Ocampo told his counsel that he wasn't prepared to change his not guilty plea because, was not clear for him, his participation in the offense in the way that the government presented defendant's case at the court."  Ocampo Mot. 4.  Because Ocampo had open questions about this change of plea, DFPD Gray was not ineffective in seeking a continuance to address his questions.

        Likewise, DFPD Gray was not deficient in failing to raise a Speedy Trial violation prior to Ocampo's Change of Plea.  The December 13, 2004 stipulation was not subject to attack by DFPD Gray.  It set forth Ocampo's need for additional time to investigate and prepare for trial, that the ends of justice by continuing the trial outweigh the best interest of the public and Ocampo in a speedy trial, and that the time period from January 11, 2005 up to and including June 1, 2005 is excludable time under the Speedy Trial Act.  The August 30, 2004 stipulation prepared and signed by Ocampo's former attorney stated that the "trial date is continued because additional time is needed to prepare" and that the "ends of justice are best served by granting a continuance in this matter and that the ends

of justice served by the continuance outweigh the interest of the defendants and the public in a speedy trial." At most, the stipulation failed expressly to state that the time period covered by the continuance was excluded under the Speedy Trial Act.

The court concludes that DFPD Gray was not deficient based on a claimed failure to seek a dismissal based on a Speedy Trial Act violation. After all, Ocampo's former counsel agreed to continue the original trial date "because additional time is needed to prepare." In light of these facts, DFPD Gray's failure to raise such a motion, particularly where Ocampo decided to enter a plea of guilty, was not deficient. *See United States v. Palomba*, 31 F.3d 1456, 1462 (9th Cir. 1994) ("Where a defendant stipulates to the need for trial preparation, he cannot maintain that these continuances give rise to an STA violation." (quotation signals omitted)). Further, DFPD Gray may have reasoned that a Speedy Trial Act challenge would appear to be in bad faith since Ocampo's former counsel sought and received the continuance. Given these plausible reasons for not raising this issue, DFPD Gray did not perform deficiently.

### 4.    *Sentencing*

Ocampo argues that DFPD Gray provided ineffective assistance of counsel during sentencing because she: (1) waived objections to the PSR that

would result in a lesser sentence even though Ocampo brought such objections to

her attention; (2) failed to obtain a reduced sentence based on mitigating factors;

and (3) did not object to the sentencing calculation.

Regarding DFPD Gray's alleged failure to object to the PSR, both

DFPD Gray and Ocampo affirmed during the Sentencing Hearing that they "had a

full opportunity to read, review, and discuss the presentence report and the

addendum and make any and all objections to the report" that they wished.  Gov.

Ex. B 2.  Indeed, Ocampo sent DFPD Gray a list of "objections, modifications, and

ad[d]endums" to the PSR.  Ocampo Ex. P2.  On February 26, 2006, and in the

Response to Draft PSR, DFPD Gray included Ocampo's factual objection that not

all of the recovered drugs were his.

That DFPD Gray did not include all of the objections originally raised

by Ocampo, by itself, does not prove ineffective assistance of counsel.  Even

reading Ocampo's § 2255 Motion liberally, Ocampo fails to identify any

objections that he raised with DFPD Gray, other than the amount of

methamphetamine, which he believes should have reduced his sentence.  *See*

*United States v. Roberts*, 5 F.3d 365, 371-72 (9th Cir. 1993) (finding no

ineffective assistance of counsel where attorney reviewed presentence report with

defendant, and any inaccuracies either did not exist or did not affect sentencing).

Ocampo appears to believe that because he entered pleas of guilty to possess with intent to distribute 50 grams or more of methamphetamine, its salts, isomers, and salts of its isomers, and possession with intent to distribute 50 grams or more of methamphetamine, its salts, isomers, and salts of its isomers, his Guideline calculations could not exceed 50 grams. Ocampo misconstrues the Guidelines. Guideline § 1B1.3(a)(1)(A) requires the base offense level to be determined, in part, on all acts "committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant." Guideline § 1B1.3(a)(1)(B) provides that "in the case of a jointly undertaken criminal activity," the base offense level should be determined based on "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." Guideline § 2D1.1(a)(3), in turn, sets the base offense level as specified in the Drug Quantity Table. Thus, Ocampo's base offense level is determined based on *all* the methamphetamine that he conspired to possess with intent to distribute or that he possessed with intent to distribute pursuant to Guideline §§ 1B1.3 and 2D1.1.

During his Change of Plea, Ocampo admitted that: (1) on July 14, 2004, he sold approximately two ounces of methamphetamine (56.3 grams of d-methamphetamine hydrochloride of 88% purity); and (2) on July 15, 2004, he

37

possessed methamphetamine (217.3 grams of d-methamphetamine hydrochloride

of 91% purity) found in the black suitcase in the hotel room, and that he intended

to offer methamphetamine for sale to others.  These drugs, attributable to Ocampo

pursuant to Guideline § 1B1.3, result in a combined total of 273.6 grams of "ice,"

for a base offense level 34 pursuant to Guideline § 2D1.1(c)(3) (at least 150 grams

but less than 500 grams of "ice").  Given Ocampo's admissions during his Change

of Plea, DFPD Gray could not have made any meaningful objection to Ocampo's

base offense level.  Any such objection would have been futile.

Second, DFPD Gray argued, and the court took into consideration,

reasons for mitigating Ocampo's sentence.  Specifically, DFPD Gray asked that

the court sentence Ocampo to the mandatory minimum of ten years, as opposed to

within the advisory range of 135 to 168 months.[11]  Gov. Ex. B 5.  In support of a

sentence below the guidelines, DFPD Gray explained:

> Your Honor, the overall reason I'm asking the court to
> consider reducing the advisory guideline to the minimum term
> is based upon Mr. Ocampo's alienage. . . . [I]f an inmate has a
> detainer placed upon him, as does Mr. Ocampo, he will not be
> eligible for the incentives connected to [a drug treatment
> program], which are a possible sentence reduction of up to one
> year and additional halfway house prerelease time.  There's

---

[11]  Because Ocampo was not eligible for safety valve application, and the government did
not file a motion for downward departure pursuant to 18 U.S.C. § 3553(e), the court had no
discretion to sentence Ocampo below the ten-year mandatory minimum.

also statutory prerelease time that people with detainers are not
eligible for either.
. . .
Ten years is an enormous consequence. He will face
disadvantages within the federal prison system because of his
alienage and the detainer that has been placed upon him, and he
will be immediately turned over to the Immigration Service
upon completion of his term for deportation and exclusion from
this country.
        So in looking at all the factors under 3553 and the
purposes of sentencing, I'd ask the court to reduce the
minimum -- or the low end of the guideline, which is 135
months, by 15 months to the mandatory minimum term of 120
months.

*Id.* at 7-9.

DFPD Gray did not contradict herself by stating that Ocampo's

detainer prevented him from receiving sentence reductions for participating in a

drug treatment program; rather DFPD Gray was asking the court to take this fact

into account in sentencing. In determining Ocampo's sentence, the court stated that

it "probably would have gone higher than the 135 months, but I think some of the

arguments Miss Gray makes have some merit to them. They don't, I think, convince

me sufficiently to go outside the guidelines range in this case but do convince me to

go to the bottom of the guideline range in this case."[12] *Id.* at 11-12.

---

[12] Ocampo also suggests that DFPD Gray should have requested a role in the offense
reduction at sentencing. The evidence clearly shows otherwise. Given Ocampo's admissions
during his Change of Plea and the undisputed facts presented to the court, Ocampo was neither a
"minor" nor a "minimal" participant in the criminal activity pursuant to Guideline § 3B1.2.

5.     *Appeal*

Ocampo argues that DFPD Gray provided ineffective assistance of counsel during the appeal process because she did not discuss potential issues for appeal with Ocampo, and because she filed an *Anders* brief rather than substantively appeal his sentence.  Ocampo Mot. 18, 22.

"[T]he proper standard for evaluating [a defendant's] claim that appellate counsel was ineffective in neglecting to file a merits brief is that enunciated in [*Strickland*]."  *Smith v. Robbins*, 528 U.S. 259, 285 (2000). Ocampo "must first show that his counsel was objectively unreasonable . . . in failing to find arguable issues to appeal -- that is, that counsel unreasonably failed to discover nonfrivolous issues and to file a merits brief raising them."  *Id.* (citation omitted).  After making such showing, Ocampo "must show a reasonable probability that, but for his counsel's unreasonable failure to file a merits brief, he would have prevailed on his appeal."  *Id.* (citation omitted).

Even after sentencing, a defendant's counsel's "role as advocate requires that he support his client's appeal to the best of his ability.  Of course, if counsel finds his case to be wholly frivolous, after a conscientious examination of it, he should so advise the court and request permission to withdraw."  *Anders v. State of California*, 386 U.S. 738, 744 (1967).  Upon the filing of an *Anders* brief,

40

a burden is placed on the appellate court to review the record for error. "[T]he court -- not counsel -- then proceeds, after a full examination of all the proceedings, to decide whether the case is wholly frivolous. If it so finds it may grant counsel's request to withdraw and dismiss the appeal insofar as federal requirements are concerned . . . ." *Id.*

Here, DFPD Gray contacted Ocampo after judgment was entered, and Ocampo informed her that he wanted to file an appeal. DFPD Gray Decl. ¶ 15. DFPD Gray "informed Mr. Ocampo that I did not believe he had any issues to appeal. I indicated that I would be filing an *Anders* brief." *Id.* DFPD Gray made a conscientious review of the record, and determined that an appeal would be frivolous and that there were no issues to appeal. Ocampo Ex. Q.

DFPD Gray's *Anders* brief comprehensively laid out the facts of the case, and explained why she believed each of Ocampo's potential reasons for appeal was frivolous. *See United States v. Ocampo*, 2006 WL 2984386 (9th Cir. Jul. 16, 2006). Ocampo was provided an opportunity file an opposition, but did not. *See* Court of Appeals Docket No. 06-10264. After receiving DFPD Gray's *Anders* brief, and performing an independent review of the record, the Ninth Circuit determined that there were "no grounds for relief on direct appeal," and granted her motion to withdraw. *United States v. Ocampo*, 207 Fed. Appx. 756

41

(9th Cir. 2006).  Because the Ninth Circuit agreed with DFPD Gray's analysis that there were no grounds to appeal, her conduct in filing an *Anders* brief cannot be found to be deficient. *Harris v. Bartos*, 2006 WL 2683517, at *5 (D. Ariz. Sept. 18, 2006); *United States v. Boggs*, 2007 WL 433076, at *15 (E.D. Ky. Feb. 2, 2007).

From the record presented, DFPD Gray met her *Anders* obligations; there were no grounds for appeal other than Ocampo's mistaken view of the law. Indeed, the court reviewed each of Ocampo's arguments here, and found that Ocampo has raised no meritorious arguments.  Thus, DFPD Gray neither acted unreasonably nor caused Ocampo any prejudice.

### III.  CONCLUSION

For the foregoing reasons, the court DENIES Ocampo's Motion to Vacate, Set Aside, or Correct Sentence Under 28 U.S.C. § 2255, and DENIES Ocampo's Motion for Appointment of Counsel and for Evidentiary Hearing.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, February 29, 2008.



/s/ J. Michael Seabright
_____
J. Michael Seabright
United States District Judge

*Barajas-Ocampo v. United States*, CIV. NO. 07-00522 JMS/BMK, CR. NO. 04-00279 JMS, Order Denying Ocampo's (1) Motion to Vacate, Set Aside, or Correct Sentence under 28 U.S.C. § 2255, and (2) Motion for Appointment of Counsel and for Evidentiary Hearing